**Lucila BIGAY, et al., Plaintiffs,**

v.

**The TACO MAKER, INC., et al., Defendants.**

**Civ. No. 89–0502 (JAF).**

United States District Court, D. Puerto Rico.

Feb. 5, 1990.

464

Rafael Baella–Silva, San Juan, P.R., for plaintiffs.

Danilo M. Eboli, Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, San Juan, P.R., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

The plaintiffs in this case, Lucila Bigay ("Mrs. Bigay") and Sucesión Pedro A. Bigay, Inc. ("Sucesión"), are owners and operators of various "Taco Maker" fast-food restaurants in Puerto Rico. Since 1978 they have participated in a business franchising relationship with codefendants The Taco Maker, Inc. ("Taco Maker"), and Taco Maker's president, Gil L. Craig.[1] The complaint alleges that defendants are liable for a violation of the civil RICO statute, 18 U.S.C. § 1964(c), as well as for breach of contract and libel. Jurisdiction is based on the existence of a federal question as well as on diversity of citizenship. The case is submitted on defendants' motions for summary judgment on each of the claims. We address each cause of action in turn, filling in the pertinent facts as needed.

### I. *Civil RICO*

#### A. *The Facts*

For the purposes of evaluating the civil RICO claim, the facts alleged by plaintiffs are assumed to be true. In 1978, Mrs. Bigay entered into a franchising agreement with Taco Maker whereby she opened two fast-food restaurants in Puerto Rico, one in Country Club and one in Plaza Carolina. By March of 1981, the Bigay family's interest[2] had expanded to include three addi-

---

1. Mr. Craig's wife is also a named defendant, although it is clear that her liability, if any, stems solely from the actions of her husband.

2. As will become apparent in our discussion of plaintiffs' libel claim, there is a controversy as to who were the actual named franchisees of the respective Taco Maker stores, the choices being

Mrs. Bigay, her sons Pedro A. Bigay Silva and José A. Bigay Silva, or Sucesión, the corporation for which Mrs. Bigay serves as president. As this controversy is not material to the civil RICO claim, we simply refer to the "Bigay family interest" in this section.

tional restaurants located in Isla Verde, Campo Rico and Condado. In the meantime, Mrs. Bigay incorporated Sucesión for the purpose of administering the stores and established herself as its president.

Under the franchising agreement, each retail store in Puerto Rico was required to pay royalty fees to Taco Maker in the amount of five percent (5%) of the store's monthly gross sales. While this was clear enough, a controversy arose over whether the royalties were subject to taxation by the Commonwealth of Puerto Rico. Taco Maker initially took the position that they were exempt from taxes. Nevertheless, in July of 1984 Puerto Rico's Treasury Department informed Sucesión that it had a deficiency of $56,593.03 which Sucesión should have retained from royalties paid to Taco Maker.

On June 25, 1986, codefendant Craig, acting as president of Taco Maker, agreed in writing with Mrs. Bigay, acting as president of Sucesión, to open a joint savings account in which to deposit 29% of all royalty payments until the tax situation could be cleared with the Treasury Department. Then, on April 20, 1988 Mr. Craig allegedly opened another account in his own name into which he started depositing the checks that Sucesión issued for the 29% retention. Plaintiffs further allege that by December 31, 1988, Mr. Craig had used the personal account to "illegally appropriate[ ] ... the sum $16,886.53 with the intention of defrauding" Sucesión. (Complaint at 12). Finally, it is alleged that as a part of this scheme "checks were sent to [Taco Maker] in Ogden, Utah, through the United States Mail ..." (complaint at 12).

### B. *Discussion*

Plaintiffs attempt to shape the aforementioned scenario into a violation of section 1962(c) of the RICO statute, which prohibits conducting or participating in the conduct of an enterprise through a pattern of racketeering activity. 18 U.S.C.

§ 1962(c);[3] *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Section 1962(c) poses several requirements of plaintiffs, but we need only be concerned with two.

First, the First Circuit repeatedly has held that the "person" who engages in the pattern of racketeering activity (*i.e.*, the defendant) must be distinct from the "enterprise" affecting interstate commerce; under section 1962(c) the enterprise is not liable. *Odishelidze v. Aetna Life and Casualty Co.*, 853 F.2d 21, 23 (1st Cir.1988); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 29 (1st Cir.1987); *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir.1986). Nor can a corporation be held liable under the doctrine of *respondeat superior* as long as it constitutes the RICO enterprise. *Schofield*, 793 F.2d at 32–33.

Nowhere in the complaint is the enterprise element explicitly stated, although a generous reading of the document reveals that the only possible candidate is codefendant Taco Maker. Moreover, plaintiffs in their opposition brief concede that Taco Maker is indeed the enterprise. (Memorandum attached to Docket Document No. 21 at 14). Because codefendant Taco Maker is deemed to be the enterprise, it cannot also be the RICO defendant. Therefore, the civil RICO claim against Taco Maker is now DISMISSED.

Second, the civil RICO claim is also deficient against the remaining codefendants because plaintiffs have not alleged facts constituting a "pattern of racketeering activity" as outlined by the Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). There, the Court explained that while the RICO statute only requires at least two predicate

---

**3.** Subsection 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

acts within ten years,[4] two acts standing alone may not be sufficient to constitute a "pattern." *Id.* 109 S.Ct. at 2899. To form a pattern, the predicate acts must be related and amount to, or threaten the likelihood of, continued criminal activity. *Id.* at 2901–02; *Fleet Credit Corp. v. Sion,* 893 F.2d 441 (1st Cir.1990). Moreover, with regard to "continued criminal activity," the Court in *H.J., Inc.* stated the following:

> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicate acts extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*H.J., Inc.,* 109 S.Ct. at 2902.

■ Even accepting the allegations as true, the complaint does not rise to this standard. In the first place, the only predicate acts alluded to are confined to a period of just over eight months—*i.e.,* from the time Craig opened his personal account (April 20, 1988) until December 31, 1988. The alleged fraud arose out of a single, specialized agreement to handle amounts arguably owed to the Commonwealth of Puerto Rico in taxes, and there is no indication that the scheme was widespread; the plaintiffs are the only ones injured by the conduct. Furthermore, while the complaint alleges mail fraud as the predicate acts, *see* 18 U.S.C. § 1341, it does not say how many checks were mailed or give the dates the mailings occurred. *Cf. New England Data Services, Inc. v. Becher,* 829 F.2d 286, 292 (1st Cir.1987) (RICO complaint fails to satisfy Rule 9(b)'s particularity requirement where plaintiffs do not include any description of the time, place or content of the communication). Even accepting the assertion in plaintiffs' brief that defendants mailed "eighteen checks,"[5] we note that eighteen checks in eight or nine months falls far short of the schemes evaluated by the Supreme Court in *H.J., Inc.* (bribes occurring with frequency over six years) and by the First Circuit in *Sion* (95 mailings over a four and one-half year period). In short, plaintiffs have failed to allege "a high number of related predicate acts committed over a substantial period of time. . . ." *Sion, supra,* at 446.

Plaintiffs have also failed to demonstrate a *threat* of continued criminal activity. A threat is said to be present when the predicate acts constitute "past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.,* 109 S.Ct. at 2902. While this standard "depends on the specific facts of each case," it may be satisfied by showing that "the predicate acts are a regular way of conducting a defendant's ongoing legitimate business." *Id.*

No such showing is suggested from anything plaintiffs have submitted. Rather, the alleged predicate acts fall within a closed period of time and concern only one of a multitude of franchisers doing business with defendants. Even then the predicate acts concern only a small aspect of defendants' business relationship with plaintiffs—the keeping of an account for retaining disputed tax proceeds—and even this account was admittedly a temporary measure scheduled to last only until defendants' tax status in Puerto Rico was clarified. There is no indication that defendants "regularly" conducted their business in an illegal manner, or that the predicate acts projected themselves into the future. There, plaintiffs also fail to state a threat of continued criminal activity.

Because the pattern requirement has not been met, the civil RICO claim must be DISMISSED against all defendants.

## II. *Breach of Contract*

■ Turning to the breach of contract claim, plaintiffs allege that as part of their "business understanding" with Taco Maker the defendants were obligated to provide economic and administrative counseling for all aspects of plaintiffs' business. Plaintiffs claim that, with respect to the stores

---

**4.** *See* 18 U.S.C. § 1961(5).

**5.** Plaintiffs do not specify whether the eighteen checks were mailed separately or together.

in Condado and Isla Verde, defendants did not fulfill their counseling obligation in good faith, resulting in economic damages in both cases. After examining the flimsy particulars of plaintiffs' allegations and filings, we conclude that the breach of contract cause cannot be sustained.

With regard to the Condado store, plaintiffs claim that in 1981 defendants approved construction of the restaurant and that this approval was given in bad faith because another franchise owner, Lawrence Rapaport, had expressed his opinion to defendants that the site was not a good one and that any restaurant constructed there would be doomed to failure. Even assuming this is true—Mr. Rapaport's affidavit has not been submitted—we do not believe bad faith is established in this context. Plaintiffs have submitted no authority holding that defendants can be found liable for a store's failings simply for disagreeing with the opinion of a single franchisee. We note that there is no indication that the interests of the defendants were contrary to those of plaintiffs at the time the building site was authorized. In short, there is nothing to support the inference that the advice of Mr. Rapaport—assuming it was given—was rejected out of bad faith.[6]

As for the Isla Verde store, plaintiffs allege the following: that José A. Maldonado offered Sucesión $50,000.00 for the equity of what was a losing operation; that Taco maker hindered the transaction by stating the store would be purchased by Alec Hart; that Mr. Hart never made an offer; and that Mr. Maldonado soon after lost interest. Again, plaintiffs contend that this alleged interference constitutes bad faith and breach of defendants' duty to counsel, and that defendants are liable for the Isla Verde store's losses.

We disagree. The plaintiffs' right to transfer their interest in the Isla Verde store is set forth in the franchising agreement and is expressly subject to Taco Maker's written consent and to the prospective purchaser agreeing to enter into all agreements between Taco Maker and Sucesión. *See* Motion for Summary Judgment, Exhibit 3 Section 24. When contractual terms are clear, their literal sense will be respected. *See* 31 L.P.R.A. § 3471. There is no indication in the docket that plaintiffs attempted to comply with the requirements of Section 24, nor have plaintiffs alleged that Mr. Maldonado planned to step into their shoes with respect to the defendants—indeed, plaintiffs concede that Mr. Maldonado was only interested in obtaining "the leasing rights and key" of the Isla Verde store, not the franchise itself. As this much is uncontroverted, we must conclude Taco Maker was within its rights to attempt to find a new purchaser or to reject the sale to Maldonado outright. Therefore, the breach of contract claim is meritless and must be DISMISSED.

### III. *Libel*

The libel cause of action stems from a letter dated August 2, 1988 and signed by Taco Maker's Executive Vice President, Wayne P. Webster, Jr.[7] This letter, which was sent to all Taco Maker franchise owners in Puerto Rico and to seven other people, includes a list of franchise operators claimed to have outstanding debts to Taco Maker's advertising fund. Included in the list is Lucila Bigay, whose alleged debt to the fund is said to be a total of $6,192.60 arising from the operation of restaurants at Borinquen, Isla Verde and Plaza Carolina.

Defendants argue that all representations in this letter were true, falsity be-

---

6. Plaintiffs raise one additional argument in connection with the Condado store, and that is that they delayed the sale of the same based on defendants' assurances to turn the Condado restaurant into a "pilot store." However, the time frame offered by plaintiffs indicates that they did not delay for long, if at all, and that any damage they suffered was not due to this delay. Indeed, plaintiffs did not inform Taco Maker of their intention to close the Condado store until January 1983, and the store closed almost im-

mediately thereafter. Plaintiffs' Memorandum at 8.

7. We note that Mr. Webster is not a codefendant in this case and that the complaint contains no suggestion that codefendants Mr. and Mrs. Craig had any hand in the allegedly libelous publication. Therefore, we read the libel cause of action as pertaining only to the corporate codefendant—*i.e.*, Taco Maker.

ing requisite to a libel cause of action in Puerto Rico and truth being a defense. *See* 32 L.P.R.A. § 3146a; *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432 (1977); *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415 (1977). Mrs. Bigay, however, contends the letter was false and libelous for two reasons. First, Mrs. Bigay claims that she was never obligated to Taco Maker *in her personal capacity* and that the debts owed to the advertising fund, if any, were the obligations of either Sucesión or her sons Pedro A. Bigay Silva and José A. Bigay Silva. Second, Mrs. Bigay argues that neither she nor Sucesión had advertising fund debts outstanding in the amount stated in the letter.

We think plaintiffs' first argument is misplaced. All the evidence submitted in this case clearly indicates that Mrs. Bigay was the contact person for the Bigay family and for Sucesión in their relationship with the defendants, this notwithstanding the fact that one or another of the restaurants may have been in someone else's name. The docket reveals that for purposes of reputation the names Lucila Bigay and Sucesión are interchangeable. Plaintiffs tacitly concede this fact by alleging damage to Sucesión's reputation even though Sucesión was never mentioned in the offending letter. Moreover, we query whether Mrs. Bigay would have felt any less defamed if it were Sucesión that was labeled as delinquent.

■ The real issue, as the court sees it, is whether defendants erroneously stated that the Bigay/Sucesión advertising account was overdue and whether plaintiffs were injured thereby.[8] As for the actual existence of an advertising debt, the documents submitted boil down to a swearing match. Defendants have filed the sworn statement of Mark Bailey, Senior Vice President of Taco Maker's Caribbean Oper-

ations, who contends that "Mrs. Bigay owed as advertising fees the amounts stated in the breach letter sent [i]n August 1988."[9] Plaintiffs, however, have stated in a number of places that the only advertising fees owed were those for the month of June, 1988.[10] In short, neither party has submitted concise and conclusive evidence as to the true state of plaintiffs' advertising fund account as of August 2, 1988.

Nevertheless, we note a likelihood that this issue may be resolved by the filing of documents evidencing amounts owed, paid and received by the parties with respect to the advertising account. Furthermore, we note that this issue overlaps with defendants' counterclaim, which alleges that plaintiffs are behind in certain royalty and advertising fund payments. Therefore, pursuant to *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), defendants are ordered to file within twenty (20) days of this order an additional dispositive motion as to the libel claim, as well as a motion for summary disposition of their counterclaim. Said motions may be included in a single document and should be accompanied with appropriate documentation as discussed herein. Plaintiffs will then have fifteen (15) days to oppose these motions and to file their own summary judgment motion on the counterclaim.

### IV. *Conclusion*

Summary judgment is GRANTED in favor of defendants on the civil RICO and breach of contract claims. It is DENIED as to the libel claim pending further submissions in compliance with this order.

IT IS SO ORDERED.

---

8. We note that under Puerto Rico law plaintiffs may only recover compensatory—and not punitive—damages in a libel case. *Cooperativa de Seguros Múltiples de Puerto Rico v. San Juan,* 289 F.Supp. 858 (D.P.R.1968).

9. The "breach letter" is not attached to Mr. Bailey's statement, and we query whether the amounts stated therein jibe with those claimed in the separate August 2, 1988 letter giving rise to the libel claim.

10. Actually, plaintiffs' claim is that this was the only month "overdue" as of June 30, 1988, leaving open the question of whether any amounts for the months of July and August were also owed.