Jessie L. JOHNSTON, Sarah Johnston and Fred F. Johnston, Jr., Plaintiffs,

v.

Richard WILBOURN, Archie McDonnell, Sr., Archie McDonnell, Jr., Citizens National Bank and the Stonewall Bank, Defendants.

Civ. A. No. E87–0074(L).

United States District Court, S.D. Mississippi, E.D.

Jan. 11, 1991.

William E. Ready, George L. Follett, Meridian, Miss., James C. Martin, James R. Mozingo, Stennett, Wilkinson & Ward, James E. Becker, Jr., Michael O. Gwin, Watkins & Eager, Jackson, Miss., for plaintiffs.

R.B. Deen, Jr., Deen, Cameron, Pritchard, Young, Kittrell & Loeb, Meridian, Miss., Charles K. Reasonover, Robert E. Kerrigan, Jr., Duris L. Holmes, Charles P. Carriere, III, Deutsch, Kerrigan & Stiles, New Orleans, La., Arlo Temple, Meridian, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendants Richard Wilbourn, Archie McDonnell, Sr. and Archie McDonnell, Jr. and the separate motion of defendants Citizens National Bank and Stonewall Bank for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs Jessie L. Johnston, Sarah Johnston and Fred F. Johnston, Jr. have responded to the motions and the court has considered the memoranda of authorities together with attachments submitted by the parties.

This case involves a sale by plaintiffs of their shares of Stonewall Bank stock to defendants Wilbourn, McDonnell, Sr. and McDonnell, Jr. Plaintiffs allege that defendants violated federal securities laws, specifically Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, in connection with their purchase. In addition, plaintiffs have asserted state law claims against defendants for fraud and breach of fiduciary duties. The following facts, as revealed by the parties' statements of undisputed material facts submitted in accordance with Local Rule 8(d), are undisputed.

FACTS

In 1977, McDonnell, Sr. and Wilbourn purchased 362 (52%) of the 700 outstanding shares of Stonewall Bank common stock, for $714 per share, each purchasing one-half. At the time of their purchase of Stonewall Bank stock, McDonnell, Sr. and Wilbourn were minority shareholders and directors of Citizens National Bank of Meridian. McDonnell, Sr. was also president of Citizens National. From 1977 to 1987, McDonnell, Sr., Wilbourn and McDonnell, Jr. were members of the board of directors of Stonewall Bank; McDonnell, Sr. remained president of Citizens National Bank and was also president of Stonewall Bank;

he was, as well, chairman of the boards of directors of both banks. Wilbourn was a vice-president of Stonewall Bank and acted as legal counsel for both banks. McDonnell, Jr. made investments for Stonewall Bank and managed Stonewall Bank for a period of time.

When they purchased the Stonewall stock in 1977, Wilbourn and McDonnell, Sr. entered into an agreement between themselves, entitled Agreement to Purchase Stock of The Stonewall Bank (the buyout agreement), under the terms of which each agreed that he would not dispose of his one-half of the 52% of the Stonewall Bank stock without first offering it to the other. The purpose of the agreement was for McDonnell and Wilbourn to avoid ever holding a minority interest in Stonewall Bank. The agreement established a buyout price at 1.19 times book value, the price which McDonnell and Wilbourn had paid for the majority interest in 1977.

Prior to 1977, the Stonewall Bank had experienced financial problems, but following 1977, earnings were increased from approximately $7000 to more than $100,000 annually. In 1985 and 1986, however, a number of other problems arose. In 1985, the Southeast Bank moved a branch outside of Stonewall. This was seen as a threat because Stonewall Bank was small and did not appear to be able to grow as an independent bank in the markets it was serving from its existing locations. The home office and domicile of Stonewall Bank were, therefore, moved to Quitman with a branch office remaining in Stonewall. Due to the added expense of the Quitman office, competition in the markets and slow growth of the Quitman deposits, earnings began to decrease. Around the same time, Stonewall Bank's vice-president and manager resigned, and during the period between his resignation and the hiring of a new bank manager, it was learned that there were some inefficiencies and questionable loans which required special collection efforts.

According to defendants, as a result of the problems which had arisen, Wilbourn became concerned with the buyout agreement; he did not want to be faced with buying control of Stonewall Bank at a price of 1.19 times book value if anything should happen to McDonnell, Sr., nor did he want to risk becoming a minority shareholder or risk having to manage Stonewall Bank if he exercised the option. Thus, from time to time prior to 1986, Wilbourn suggested to McDonnell, Sr. that they approach Jessie Johnston and attempt to purchase a block of 258 shares of Stonewall Bank stock owned by the Johnston family.[1] In May 1986 McDonnell agreed and on May 20, 1986, the two approached Jessie Johnston regarding purchasing her family's stock.[2] On that date, they met with Jessie Johnston at her home in Enterprise and offered to pay Mrs. Johnston $1000 per share for her stock. Mrs. Johnston, defendants state, was pleased with the offer and indicated that she would discuss it with her son, Fred Johnston, Jr. Plaintiffs dispute that Mrs. Johnston was pleased with the offer, but agree that she indicated she would discuss the offer with her son.

Subsequent to the May 20 meeting, additional meetings were held with Fred Johnston, Jr. in Meridian to discuss the purchase of the Johnston stock. On July 12, 1986, McDonnell, Jr. and Wilbourn met with Fred Johnston, Jr. and his son, Clayton. McDonnell, Jr. attended the meeting at the request of his father, who was out of town at that time. A subsequent meeting was held on September 20, 1986 between McDonnell, Sr., McDonnell, Jr., Wilbourn and Fred Johnston, Jr. At these meetings, Dr. Johnston insisted on receiving a price for the stock greater than book value and

1. Plaintiffs argue that the reason defendants desired to purchase the Johnston stock was not to avoid the effects of the buyout agreement but rather so that they could proceed with a merger of Citizens National Bank and Stonewall Bank. In either event, it is undisputed that Wilbourn did suggest to McDonnell, Sr. prior to 1986 that they try to procure the Johnston stock.

2. Defendants assert that McDonnell, prior to May 1986, never responded to Wilbourn's suggestions of approaching Mrs. Johnston regarding the stock. The plaintiffs dispute this assertion.

requested that a letter be written to his mother setting forth any such offer but not restating the substance of their discussions. Although they rejected the idea that the stock was worth more than book value to them at that time, McDonnell, Sr. and Wilbourn agreed to offer Mrs. Johnston $1100 per share, and on October 23, 1986, a letter was mailed to Mrs. Johnston offering to pay her $1100 per share plus the 1986 dividends for the stock. Mrs. Johnston, on November 7, 1986, rejected the offer and asked for $1500 per share. On November 12, 1986, Wilbourn declined this offer. After the deadline for the original offer had expired and Wilbourn and McDonnell, Sr. had rejected plaintiffs' counteroffer, Fred Johnston attempted further to negotiate a price higher than $1100 per share. When a higher price was refused, the Johnstons offered to sell their stock for $1100 per share; the parties further agreed that Mrs. Johnston would retain two shares in order to remain on the Stonewall Bank Board.[3]

Prior to November 20, 1986, McDonnell, Sr. offered McDonnell, Jr. the opportunity to purchase one-half of the Johnston stock. McDonnell, Jr. agreed and on or about November 19, entered into a verbal agreement with his brother, John, whereby each would purchase one-fourth of the stock.[4] On November 20, McDonnell, Sr. and McDonnell, Jr. traveled to Enterprise to deliver the checks for the stock. The checks were drawn on the accounts of Wilbourn and McDonnell, Jr., with McDonnell, Jr. being reimbursed for his brother's one-fourth of the shares on the same date. On November 20, Wilbourn and McDonnell, Sr. also

sent a letter to the remaining Stonewall Bank stockholders offering to purchase their shares for the same price, $1100 a share.

On the following day, November 21, 1986, McDonnell, Sr. requested that McDonnell, Jr. inquire into the regulatory and legal requirements for a merger between Citizens National Bank and Stonewall Bank. Sometime between November 21 and December 1, 1986, McDonnell, Jr. received a packet of merger application materials from the Office of the Comptroller of the Currency (OCC) in Atlanta and began studying the merger requirements. It was first necessary to propose a merger to the Citizens National Bank board of directors. McDonnell, Jr. began drafting an agreement to merge. On or about December 1, it was decided that the agreement to merge would be drafted on a stock-for-stock exchange based on 13.02 shares of Citizens National Bank stock for one share of Stonewall Bank stock; this represented a book-for-book exchange which was based on the rate used in a previous merger between Citizens National Bank and The Macon Bank. Rough drafts of an agreement to merge were prepared on that basis. However, on December 4, 1986, McDonnell, Sr. suggested to Wilbourn a change in the ratio, and ultimately, the proposed agreement to merge included an exchange rate of seventeen shares of Citizens National Bank stock for each share of Stonewall Bank stock.[5] Also on December 4, 1986, McDonnell, Sr. and Wilbourn entered into a "memorandum of agreement" in which

---

**3.** Plaintiffs dispute that these were the only meetings, conversations and/or communications concerning the purchase of the Johnston family stock and dispute that this constitutes a complete recitation of the events that transpired subsequent to the meetings, conversations and/or communications concerning the purchase of the Johnston family stock. However, they have offered no proof concerning any other meetings or discussions or of other pertinent events.

**4.** Though plaintiffs dispute that there was such an agreement between McDonnell, Jr. and his brother, John, they have demonstrated no basis for this dispute.

**5.** The proposed change was based on the fact that McDonnell, Sr. and Wilbourn had paid 1.19 times book value when they purchased the Stonewall Bank stock in 1977. Since that time, the book value of the Stonewall Bank stock had doubled. After reviewing information relating to similar transactions, which showed that the average book multiple for bank mergers in Mississippi from 1981 through 1984 was 1.51 times book value, it was agreed that the proposed exchange ratio would be determined at a rate between 1.25 and 1.35 times book value which would yield no fractional shares. McDonnell, Jr. determined that a value of 1.3 times book value would work out to seventeen shares of Citizens Bank stock for each share of Stonewall Bank stock.

they agreed to use their best efforts to bring about a merger; this agreement replaced their original buyout agreement.[6]

The Agreement to Merge was presented to the Citizens National Bank board of directors on December 9, 1986; the eight-member board unanimously approved the proposal. Thereafter, on December 11, 1986, the Stonewall Bank board of directors, including plaintiff Jessie Johnston, unanimously approved the agreement to merge. After the agreements were signed, McDonnell, Jr. began preparation of proxy materials with the assistance of legal counsel. The merger application was filed on January 21, 1987, and a conditional letter of approval was received from the OCC dated February 3, 1987. On February 23, the Federal Reserve Board issued a letter finding no anti-competitive effects from the proposed merger. On February 25, proxy material was mailed to the shareholders of both banks, and the merger was approved at separate shareholders' meetings of the two banks held on March 17, 1987. On April 30, final approval of the proposed merger was received.

## SECURITIES FRAUD

### Motion of Individual Defendants

Plaintiffs allege that in purchasing their stock without disclosing their plans to propose and effect a merger of Stonewall Bank and Citizens National Bank, the individual defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, which make it unlawful to engage in certain fraudulent activity in connection with the purchase or sale of a security. The individual defendants seek summary judgment as to plaintiffs' claims, asserting that plaintiffs cannot establish a single element of their cause of action. To sustain their Section 10(b) and Rule 10b–5 claim, plaintiffs must prove that defendants had a duty to disclose the facts which were alleged to have been omitted, i.e., the alleged fact of the proposed merger. *Ba-*

*sic Inc. v. Levinson,* 485 U.S. 224, 239 n. 16, 108 S.Ct. 978, 987 n. 16, 99 L.Ed.2d 194 (1988) (silence, absent duty to disclose, not misleading under Rule 10b–5); *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) (no fraud absent duty to speak). Plaintiffs agree that to succeed on their claim, they must show each of the following elements:

> (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which [they] relied (5) that proximately caused [their] injury.

*Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.), *modified on other grounds,* 650 F.2d 815 (5th Cir.1981), *aff'd in part and rev'd in part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *James v. Meinke,* 778 F.2d 200, 205 (5th Cir.1985).

The individual defendants first contend that they had no duty to disclose. In support of their assertion that they owed plaintiffs no duty of disclosure, defendants recite the "majority rule ... that a director does not owe a fiduciary duty directly to the shareholders with respect to the shares of stock they own." *Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357, 375 (3d Cir.1980). It is recognized that an officer or director is not prohibited simply by virtue of his position from acting in his individual capacity in purchasing stock from shareholders, and in so doing, violates no duty. *Id.; see also Clagett v. Hutchison,* 583 F.2d 1259, 1262 (4th Cir.1978) (officer or director has same right as any other shareholder to buy or sell stock); *Fought v. Morris,* 543 So.2d 167, 172 (Miss. 1989) (generally, director violates no duty by dealing in his own stock on his own account); *Baylor v. Jordan,* 445 So.2d 254, 256 (Ala.1984) (same). It has similarly been said that "a dominant or majority shareholder has as much right as any other shareholder to sell his stock and to sell it at whatever price he may agree upon...." 18A Am.Jur.2d *Corporations* § 788 (1985).

---

**6.** As is more fully discussed *infra,* defendants assert that prior to that time, there was no agreement to bring about a merger. Plaintiffs, though, maintain that McDonnell, Sr. and Wilbourn agreed to try to effect the merger prior to

December 4, 1986; they believe that the defendants, either individually or jointly, were attempting to effect a merger prior to the purchase of the Johnston family stock.

Thus, defendants argue that since in their transaction with plaintiffs, they were merely purchasing the shares of other stockholders as personal holdings, and were not acting in their capacity as officers and directors of Stonewall Bank, they owed no duty of disclosure. However, in *Fought v. Morris,* 543 So.2d 167, the court observed that in close corporations, such as Stonewall Bank,[7] minority shareholders are particularly vulnerable and are, because of their "acute vulnerability," owed a fiduciary duty of strict fairness by the majority shareholders. 543 So.2d at 170 (citing *Orchard v. Covelli,* 590 F.Supp. 1548 (W.D. Pa.1984), *aff'd,* 802 F.2d 448 (3d Cir.1986). The court observed that in close corporations the majority is able to dictate the manner in which the corporation is run and, because the shares are not publicly traded, a fair market is seldom available to minority shareholders. Consequently, a disgruntled "minority shareholder can neither profitably leave, nor safely stay, with the corporation. Thus, the only prospective buyer is usually a majority shareholder." 543 So.2d at 171. The court ultimately concluded that

> in a close corporation where a majority stockholder stands to benefit as a controlling stockholder, the majority's action must be 'intrinsically fair' to the minority interest. Thus, stockholders in close corporations must bear toward each other the same relationship of trust and confidence which prevails in partnerships....

*Id.* Consistent with their fiduciary duty, the individual defendants owed a duty of disclosure to plaintiffs in connection with the purchase of plaintiffs' stock. The question thus becomes whether the defendants violated this duty.

The defendants' duty was to disclose material facts which were known to them by virtue of their positions, but which were not known to plaintiffs and which, if known by plaintiffs, would have affected their judgment in the transaction. *Chiarella,* 445 U.S. at 226–28, 100 S.Ct. at 1113–15

(citing *Cady, Roberts & Co.,* 40 S.E.C. 907 (1961)). Defendants dispute that they possessed any material factual information which should have been disclosed. That is, they contend that there was no plan or proposal for a merger and that the idea of a merger was not even seriously broached until after they had bought plaintiffs' stock. In *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Court concluded that

> [a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote ... [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

485 U.S. at 231–32, 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). The Court rejected the previously accepted notion that merger negotiations were not material until an agreement-in-principle was reached, finding "no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached...." *Basic,* 485 U.S. at 236, 108 S.Ct. at 986. The Court then, concluding that "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material," *Id.* at 239, 108 S.Ct. at 987, noted factors which might be considered pertinent in the materiality determination:

> Whether merger discussions in any particular case are material ... depends on the facts. Generally, in order to assess the probability that the event will occur, a factfinder will need to look at indicia of

**7.** The *Fought* court described a close corporation as a business entity with fifty or fewer shareholders, the shares of which are not publicly traded. *Fought,* 543 So.2d at 169. Stone-

wall Bank stock is not publicly traded, and the bank had approximately twenty-three shareholders at the time of the Johnston purchase.

interest in the transaction at the highest corporate levels. Without attempting to catalog all such possible factors, we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest. To assess the magnitude of the transaction to the issuer of the securities allegedly manipulated, a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value.

*Id.* at 239, 108 S.Ct. at 987. Whether the alleged information or event is material, the Court held, " 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.' " *Id.* at 238, 108 S.Ct. at 987 (quoting *Securities Exchange Comm'n v. Texas Gulf Sulpher Co.,* 401 F.2d 833, 849 (2d Cir.1986), *cert. denied sub nom., Coates v. S.E.C.,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)).[8]

▇ In the case at bar, defendants contend that there was no planned merger which they failed to disclose. They maintain that prior to November 21, 1986, no discussions had occurred with regard to the possibility of a merger. Wilbourn recalls suggesting to McDonnell, Sr. the possibility of a merger on two or three prior occasions, by merely stating that perhaps they could merge the banks; McDonnell, Sr. recalls only one such occasion, but in any event, McDonnell, Sr. never responded to Wilbourn. Wilbourn never spoke to McDonnell, Jr. regarding a merger. Defendants maintain that none of them discussed the price, the legal or regulatory aspects or the structure of a merger until after they had purchased plaintiffs' stock. At the time of the stock purchase, the legal and factual predicates for a merger were not in place. No financial documents, pro forma statements or computations were prepared, and they did not undertake to determine whether a merger was possible under federal or state law. They never contacted accountants, attorneys or regulatory authorities concerning a merger, and never discussed with anyone whatsoever the possibility of merger prior to the acquisition of the Johnston stock. Indeed, according to defendants, after they received the merger application materials from the OCC, McDonnell, Jr. became concerned with a number of potential legal and regulatory problems which could arise: (1) Citizens National Bank's capital ratio was close to the limit proscribed by the OCC and could be adversely affected by an acquisition; (2) there was a possible problem with interlocking directorates based on McDonnell, Sr.'s and Wilbourn's positions in both banks; (3) antitrust problems were possible because of the banks' positions in adjacent markets, raising concerns about the Justice Department's index on competitive effects; and (4) state approval could be a problem because of restrictions on branch banks. But despite these concerns, McDonnell, Sr., McDonnell, Jr. and Wilbourn, after much discussion, decided to take steps toward a possible merger. Finally, defendants assert that neither Wilbourn, McDonnell, Sr. or McDonnell, Jr., individually or together, had the authority or power to implement a merger.

Plaintiffs strenuously dispute defendants' assertions in this regard. They agree that the four factors which are said to have concerned McDonnell, Jr. pertaining to legal and regulatory requirements are factors to be considered by any two financial institutions contemplating a merger, but aver that under the facts of this case, the denial of the merger application was unlikely. They also claim that the facts tend to support the inference that the defendants took steps toward the merger before their acquisition of the Johnston family stock and that merger discussions

---

**8.** Regarding the magnitude of the event, the Court observed that a privately held corporation's merger negotiations become material at an earlier stage than that of publicly held corporations because of the significance of a merger to a privately held corporation. *Basic,* 485 U.S. at 238–39, 108 S.Ct. at 986–87 (quoting *Securities Exchange Comm'n v. Geon Indus., Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976)).

occurred prior to the purchase of the stock. They contend that considerable circumstantial evidence supports the inference that defendants had contemplated and discussed merging the two banks prior to the purchase of the stock, and they urge that evidence supports the inference that considerably more planning was done than defendants allege. That there was such planning, plaintiffs contend, is to be inferred from the fact that less than twenty-four hours after completing the purchase of plaintiffs' stock, defendants decided to proceed with a merger of the two institutions and began accumulating forms and information concerning a merger; within three weeks, the boards of both banks had approved a merger. Plaintiffs further contend that, due to the positions held and the stock owned by the three individuals in the two institutions, they clearly had the authority and power to guide, persuade and implement the merger. Furthermore, they assert that these defendants, whether or not they had authority and power to implement a merger, certainly occupied positions of authority with the banks which, in conjunction with the other pertinent facts, establish the materiality of the defendants' merger discussions and establish special circumstances obligating them to disclose their preliminary merger discussions.

It has been said that it is the rare case in which materiality can be decided on a summary judgment motion. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976) (determination of materiality requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact"); *McLaury v. Duff and Phelps, Inc.*, 691 F.Supp. 1090, 1096 n. 4 (N.D.Ill.1988) (quoting *TSC Indus., Inc.*). This is not one of those rare cases. In the court's opinion, there exists a question of fact which is appropriately reserved for the trial of this case in regard to whether any merger discussions had progressed to a point at which disclosure became necessary.

Defendants next urge that since any information they may have possessed concerning a possible merger did not come to them by virtue of their positions in the corporation, they can have no liability. While interesting, this assertion is at this stage unavailing. It is apparently defendants' argument that even if there existed at the time of the Johnston stock purchase a plan to merge the two banks, which they deny, the idea for such a merger was developed by Wilbourn, McDonnell, Sr. and McDonnell, Jr. and was not shared with the bank boards; therefore, since they were responsible for conceiving the merger proposal, the information was theirs personally, and was not derived from the banks. There is, in the court's opinion, at least a question of fact concerning whether the information was subject to disclosure. In the court's view, questions of fact also remain concerning whether defendants acted with scienter, as that term has been defined by the Fifth Circuit, *see Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir.1987), and on the issue of reliance. Finally, the court is also of the opinion that questions of proximate cause remain for trial.[9]

*Banks' Motion*

Plaintiffs allege that the individual defendants acted on behalf of the banks as well as acting individually in procuring the purchase of plaintiffs' stock, and that the banks aided and abetted the individual defendants' alleged securities fraud such that they are liable under Section 10(b) and Rule 10b–5. The banks seek summary judgment relative to the plaintiffs' securities fraud claims, arguing that in their purchase of the Johnston stock, the individual defendants were acting in their own behalf and were not acting on behalf of either bank. Therefore, their actions cannot be attributed to the banks. In support of their

9. It appears to be defendants' contention that they would not have proposed a merger if they had not been able to acquire the Johnston stock; they did not want the Johnstons owning any of the Citizens National Bank Stock. That is, defendants argue that if plaintiffs had not sold their stock, there would have been no merger, and plaintiffs would not have been damaged.

position that the individual defendants acted on behalf of the banks in the transaction, plaintiffs state that because McDonnell, Sr. was president, a director and chairman of the boards of directors of both banks, and Wilbourn was a director, vice-president and legal counsel to Stonewall Bank and a director and legal counsel to Citizens National Bank, "certainly, Mrs. Johnston perceived the defendants to be [dealing with her] as representatives of the banks." Even assuming that this was in fact her perception,[10] plaintiffs have cited no evidence to suggest that any of the individual defendants held themselves out as acting on behalf of the banks or did anything to foster an impression that they were acting in a capacity as bank representatives. That is, plaintiffs have not suggested that Wilbourn, McDonnell, Sr. or McDonnell, Jr. took any action which would have created a perception that they were acting on behalf of the banks. In fact, the evidence tends to show that the individual defendants were acting in their own behalf. Correspondence from the individual defendants to Mrs. Johnston was not on bank letterhead, but on blank stationery. Moreover, the checks which were used to pay the Johnstons were drawn on the individual defendants' personal bank accounts. Therefore, contrary to plaintiffs' assertions, there is no evidence from which a jury could reasonably find that the individual defendants were acting on behalf of the banks. It follows that their actions are not attributable to the banks for the purpose of imposing liability under the federal securities laws.

To prevail with respect to their aiding and abetting count, plaintiffs must prove (1) that the individual defendants committed a securities law violation, (2) that the banks had a "general awareness" that its role was part of an overall activity which is improper, and (3) that the banks "knowingly rendered substantial assistance" in the alleged violation. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir.1988), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989); *see also Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir.1985). The banks argue that they did not have the requisite knowledge to satisfy the second element of proof, in that they were not aware of the individual defendants' stock purchase until December 9 and 11, after the stock purchase had already been accomplished. As the court has already concluded, the knowledge of the individual defendants is not to be imputed to the corporate defendants inasmuch as there is no proof that the individual defendants were acting in a corporate capacity in their dealings with the plaintiffs. And since there is no proof that the banks were otherwise aware of the defendants' activities relative to plaintiffs' stock, the court concludes as a matter of law that plaintiffs cannot satisfy their burden to prove the banks' "general awareness" of their role in the defendants' allegedly improper activities.[11]

■ Plaintiffs' second cause of action against the banks charges that the banks are liable for failing to publicly announce that a merger agreement had been struck in principle when they became aware of the inside trading by the individual defendants. However, since plaintiffs have expressly denied having alleged that the banks violated the disclose or abstain rule embodied in Rule 10b–5, the basis of this putative duty to disclose—and hence plaintiffs' cause of action—is unclear. Nevertheless, so far as the banks were aware, by the time the merger agreement had been struck in principle, the Johnston stock had already been purchased by the individual defendants.

**10.** The statement concerning Mrs. Johnston's alleged perception appears only in plaintiffs' brief. Plaintiffs have cited to no such statement by Jessie Johnston in the record.

**11.** The plaintiffs, in an effort to avoid the dispositive effect of the banks' lack of awareness of the proposed stock purchase, urge that the banks ratified the defendants' conduct and accepted its benefits by agreeing to the merger.

However, the banks did nothing more than approve the agreements to merge on December 9 and 11. These approvals did not assist the individual defendants in their purchase of the Johnston stock, for that had already been accomplished. It is simply not reasonable to conclude that the banks ratified the stock purchase by agreeing to the merger.

Disclosure by the banks at that point would not have prevented that transaction. Plaintiffs' second cause of action against the banks appears, therefore, to be baseless.

In summary, there is no evidence that the banks had knowledge of the individual defendants' purchase of the Johnston stock but took no action with respect thereto. Accordingly, the banks are entitled to the entry of summary judgment as to plaintiffs' allegations that the banks violated securities regulations.

RICO

■ Plaintiffs have alleged that all defendants are liable under section 1962(b) and (d) of RICO, 18 U.S.C. § 1962(b) and (d). They allege that defendants acquired or maintained an interest in both Stonewall Bank and Citizens National Bank through a pattern of racketeering activity in violation of section 1962(b), and conspired to violate section 1962(b) in violation of section 1962(d). Defendants assert in their motions for summary judgment that plaintiffs have not alleged a "pattern of racketeering activity," and that consequently, the RICO causes of action are subject to dismissal. Section 1962(b) provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through the collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.[12]

Thus, in order to prove their RICO claims, plaintiffs must prove a pattern of racketeering activity, which is defined at 18 U.S.C. § 1961(5) as requiring "at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." Recently, the United States Supreme Court was called upon to consider what conduct meets RICO's pattern requirement. In *H.J. Inc. v. North-*

*western Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Court concluded that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.,* 109 S.Ct. at 2900. Defendants do not dispute, at least for purposes of this motion, that the alleged predicate acts are related. They argue, however, that plaintiffs' RICO claims must be dismissed inasmuch as plaintiffs' allegations and proof do not satisfy the continuity requirement. In *H.J. Inc.,* the Court illuminated the proof which is necessary to establish the element of continuity:

> What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.* This may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity. We can, however, begin to delineate the requirement.
>
> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. ... It is, in either case, a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way.

---

12. As an additional ground for summary judgment, the banks argued that since they were the alleged "enterprise," they could not be named as a defendant for purposes of a section 1962(b) claim. However, following the filing of the banks' motion, the Fifth Circuit explicitly recognized that a defendant can be both an enterprise and a RICO defendant for section 1962(b) violations. *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO,* 901 F.2d 404, 425 (5th Cir.1990).

In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 2902. In the case at bar, defendants' alleged scheme involved a single objective: the merger of the two banks. Once that goal was accomplished, the scheme ended. There was no threat of continuing activity once this objective was accomplished. Because the alleged scheme was closed- rather than open-ended,[13] to sustain their RICO claims, it is incumbent on plaintiffs to allege and prove a "series of related predicates extending over a substantial period of time[;] predicate acts extending over a few weeks or months" will not suffice. Accepting for present purposes plaintiffs' allegations concerning the predicate acts, it appears that these acts occurred over a period of approximately nine months.[14]

McDonnell, Sr. and Wilbourn first approached Jessie Johnston to discuss the purchase of the Johnston family stock on May 12, 1986; the merger of the two banks was approved by the shareholders March 17, 1987.[15] And during that time period, a relatively few predicate acts, approximately nine, are alleged to have been committed. It is clear that the activity at issue here is not the continuous criminal conduct with which Congress was concerned in enacting RICO. It was merely a short-lived scheme as to which there was no threat of repetition. Accordingly, the court concludes as a matter of law that plaintiffs cannot establish the requisite continuity and their claim predicated on a violation of 18 U.S.C. § 1962(b) must therefore be dismissed.[16]

**13.** In *H.J. Inc.*, the Court observed that even a scheme of short duration could involve a "distinct threat of long-term racketeering activity, either implicit or explicit, as where it is shown that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 109 S.Ct. at 2902. Plaintiffs make the outrageous argument that a jury could find that racketeering is a regular way of doing business for defendants because Citizens National Bank purchased a branch of another bank and merged with another bank in 1986, and because some defendants own stock in other financial institutions. Plaintiffs state that "defendants have engaged in purchasing stock in financial institutions, mergers and acquisitions in the past and threatened to do so in the future," and that they have an "attitude" as exemplified by their past business dealings which could lead a jury to find that they are willing to engage in illegal activities. Plaintiffs' assertion in this regard is patently frivolous. The law is clear that proof of a threat of continued criminal activity based on the regular way a business is conducted requires proof that the predicate acts themselves were a regular way of conducting the ongoing business. *See Fleet Credit Corp. v. Sion*, 893 F.2d 441, 447-48 (1st Cir.1990). Plaintiffs have not alleged that the pre-Johnston dealings were illegal but suggest only that the fact of defendants' involvement in prior mergers and acquisitions is indicative of a willingness by defendants in the future to become involved in *future mergers and acquisitions*. They have not presented one shred of evidence to suggest that racketeering is defendants' regular way of conducting business.

**14.** Plaintiffs argue that since the Supreme Court used the phrase "few *weeks* or *months*" and did not use the phrase "less than a year" or a similar phrase to describe time periods which will not

satisfy the longevity requirement in a closed-ended RICO scheme, then conduct occurring over many months approaching the year mark must be considered sufficient. They further attempt to characterize the number of months involved here as more than a "few," by resorting to a dictionary definition of "few" as "not many." Use of such semantical games flies in the face of the notion of flexibility counseled by the Court in *H.J. Inc.*

**15.** Plaintiffs make the absurd assertion that the pattern of defendants' conduct actually lasted over a number of years, about six years, rather than a number of months since Wilbourn and McDonnell, Sr. had discussed approaching Fred Johnston, Sr. before his death in 1981 to purchase his stock. They thus claim the starting date of the pattern was as early as 1981. "Pattern of racketeering activity" is defined under RICO according to the time of the predicate acts, not the dates of any discussions having nothing to do with the predicate acts. Moreover, the first predicate act which plaintiffs allege occurred on May 20, 1986; the last occurred at the latest on March 17, 1987. These allegations form the parameters of the charged pattern of racketeering activity.

**16.** This conclusion is supported by the cases which have been decided in the wake of *H.J. Inc.* No case was found in which predicate acts spanning less than a year, in a closed-ended scheme, satisfied the continuity requirement. *See Eastern Publishing and Advertising, Inc. v. Chesapeake Publishing and Advertising, Inc.*, 895 F.2d 971, 973 (4th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 3274, 111 L.Ed.2d 784 (1990) (closed-ended scheme to defraud lasting over period of only three months did not demonstrate requisite continuity or threat thereof, either by intrinsic

18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of [that] section." Since the court has determined that the claim under section 1962(b) must be dismissed and plaintiffs' conspiracy claim is based on an alleged violation of section 1962(b), the conspiracy claim will be dismissed as well. *See Leonard v. Shearson Lehman/American Express, Inc.,* 687 F.Supp. 177, 182 (E.D.Pa. 1988) (claim cannot be made under § 1962(d) in absence of viable claim under § 1962(a), (b) or (c)); *Bruss Co. v. Allnet Communication Services, Inc.,* 606 F.Supp. 401, 407 (N.D.Ill.1985).

## BREACH OF FIDUCIARY DUTY

The individual defendants seek summary judgment as to plaintiffs' state law claim that they breached their fiduciary duty by failing to disclose the plan to propose merger, on the basis that they did not occupy a fiduciary relationship to plaintiffs. That these defendants did in fact owe plain-

nature or sheer duration); *Olive Can Co., Inc. v. Martin,* 906 F.2d 1147, 1150 (7th Cir.1990) (single scheme which was to be short-lived, as to which there was no evidence that it would have been repeated in future, and which was limited to period of about six months did not meet continuity requirement); *Marshall–Silver Constr. Co. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990) (seven months would constitute only a few months); *Parcoil . Corp. v. Nowsco Well Serv., Ltd.,* 887 F.2d 502, 504 (4th Cir.1989) (alleged predicate acts consisting of seventeen falsified reports sent over period of four months not type of continuity contemplated by *H.J. Inc* ); *Menasco v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989) (defendants' actions over course of one year which were narrowly directed toward single goal, with limited purpose, one perpetrator and one set of victims clearly did not constitute ongoing unlawful activity proscribed by RICO); *Newport Ltd. v. Sears, Roebuck & Co.,* 739 F.Supp. 1078, 1081 (E.D.La. 1990) (predicate acts extending over ten-month period did not constitute pattern); *Homes by Michelle, Inc. v. Federal Sav. Bank,* 733 F.Supp. 1495, 1502 (N.D.Ga.1990) (plaintiffs had not alleged closed period of repeated conduct in violation of RICO where activity related only to development of one project and took place over short period of time, two years); *Bigay v. Taco Maker, Inc.,* 730 F.Supp. 463, 466 (D.Puerto Rico 1990) (eighteen predicate acts confined to period of eight or nine months falls far short of satisfying *H.J. Inc.'s* continuity requirement); *Disandro–Smith & Assoc. v. Edron Copier Serv., Inc.,* 722 F.Supp. 912, 916 (D.R.I.1989) (plaintiffs' allegations of three sales over closed period of approximately two years did not amount to long-term criminal conduct RICO is intended to redress); *USA Network v. Jones Intercable, Inc.,* 729 F.Supp. 304, 318 (S.D.N.Y.1989) (racketeering activity spanning only three and one half months involving relatively few criminal acts and few participants in uncomplicated scheme directed at one victim insufficient to satisfy continuity plus relationship requirement mandated by *H.J. Inc.*); *Continental Realty Corp. v. J.C. Penney Co., Inc.,* 729 F.Supp. 1452, 1455 (S.D.N.Y.1990) (conduct in closed-ended scheme occurred over too short a time period to consti-

tute long-term criminal conduct where defendant's several fraudulent acts occurred over period of more than one year); *Airlines Reporting Corp. v. AERO Voyagers, Inc.,* 721 F.Supp. 579, 585 (S.D.N.Y.1989) (single closed-ended scheme covering thirteen-month period involving three perpetrators, one victim and uncomplicated transaction failed to meet continuity requirement); *Orchard Hills Co–Op. Apts., Inc. v. Germania Federal Sav. & Loan Ass'n,* 720 F.Supp. 127, 130–31 (C.D.Ill.1989) (no continuity where facts alleged only one general scheme which took several months to complete, concerned only one major transaction, had one actual victim, caused one distinct injury and threatened no repeated harm); *Hutchinson v. Wickes Companies, Inc.,* 726 F.Supp. 1315, 1320–21 (N.D.Ga. 1989) (questioning whether two years is substantial period of time under *H.J. Inc.*). *Cf. Busby v. Crown Supply, Inc.,* 896 F.2d 833, 836 n. 2 (4th Cir.1990) (more than ten-year scheme to defraud up to one hundred salesmen of earned commissions satisfied requirements of continuity and relationship); *Morley v. Cohen,* 888 F.2d 1006 (4th Cir.1989) (duration of activities—from 1976 to 1981—sufficient to meet continuity requirement); *Walk v. Baltimore and Ohio R.R.,* 890 F.2d 688, 690 (4th Cir.1989) (activity continuing for period of ten years extended over substantial period of time so as to constitute long-term criminal conduct meeting pattern requirement, notwithstanding closed-ended nature of conduct); *United States v. Gelb,* 881 F.2d 1155, 1163–64 (2d Cir.), *cert. denied,* 110 S.Ct. 544 (1989) (requirement of continuity satisfied by schemes conducted for about five years); *Atlas Pile Driving Co. v. DiCon Financial Co.,* 886 F.2d 986, 994–95 (8th Cir.1989) (defendant's involvement in multiple related schemes over period of over three years sufficient to satisfy continuity requirement); *Rodriguez v. Banco Central,* 727 F.Supp. 759, 773 (D.Puerto Rico 1989) (numerous predicate acts over time span of at least six years extended over substantial period of time and satisfied continuity requirement); *Dooner v. NMI Ltd.,* 725 F.Supp. 153, 162 (S.D.N.Y.1989) (allegations of predicate acts over period of approximately eighteen months stated claim for RICO violation though court expressed belief that RICO issue might well be ripe for summary judgment upon completion of discovery).

tiffs a fiduciary duty is established in *Fought,* as discussed *supra.* And, in the court's opinion, there remain genuine issues of material fact relative to whether this duty was breached. The motion of the individual defendants for summary judgment as to plaintiffs' breach of fiduciary duty claim is denied. The banks' motion as to this claim is, however, granted. It is well established that a corporation owes no fiduciary duty to its shareholders, *see, e.g., Radol v. Thomas,* 772 F.2d 244 (6th Cir. 1985), nor can it be held vicariously liable for the alleged breaches of its officers and directors. *Id.* at 258.

FRAUD

█ The court is of the opinion that the individual defendants' motion for summary judgment pertaining to plaintiffs' common law count for fraud should be denied. The banks' motion pertaining to the same issue should be granted, though, for the reason that there is a lack of evidence that the banks had knowledge of the individual defendants' alleged fraudulent purchase of plaintiffs' stock until after the purchase had already been consummated. Knowledge of the allegedly false statement, or in this case omission, is an essential element of the cause of action of fraud. *See Franklin v. Lovitt Equip. Co.,* 420 So.2d 1370, 1373 (Miss.1982).

CONCLUSION

Based on the foregoing, it is ordered that the motion of defendants Stonewall Bank and Citizens National Bank for summary judgment is granted. The motion of defendants Wilbourn, McDonnell, Sr. and McDonnell, Jr. for summary judgment is granted in part and denied in part as set forth herein.

ORDERED.