Dr. Joseph I. PIPPENGER Jr., Plaintiff,

v.

McQUIK'S OILUBE, INC. an Indiana corporation and William H. Gruppe, Defendants.

No. IP 90–195 C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 25, 1994.

Order May 31, 1994.

Carson P. Veach, Harold C. Wheeler, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Philip A. Whistler, Ice Miller Donadio & Ryan, Indianapolis, IN, for plaintiff.

Steven A. Riley, J. Mark Tipps, Kay T. Lang, Bass, Berry & Sims, Nashville, TN, John F. Joyce, Bradley C. Morris, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, IN, for defendants.

## ENTRY AND ORDER OF
## MARCH 25, 1994

BARKER, Chief Judge.

This matter is before the Court on the motion of plaintiff, Dr. Joseph I. Pippenger, Jr. ("Pippenger"), for summary judgment pursuant to Fed.R.Civ.P. 56(c). The defendants, William H. Gruppe ("Gruppe") and McQuik's Oilube, Inc. ("McQuik's"), have each filed cross motions for summary judgment.

### I. Background

Most of the underlying facts are undisputed, although they are characterized differently by the parties and the differences between the inferences drawn from them are vast.

In early 1980, Gruppe started a quick lube business called McQuik's Oilube, Inc., together with long-time acquaintances Pippenger and Richard Anderson ("Anderson"). When McQuik's was incorporated, its stock ownership was distributed in equal 30% shares to Gruppe, Pippenger and Anderson. The remaining 10% was distributed to Doug Terrell ("Terrell"), another acquaintance of Gruppe's with whom he had been involved in prior quick lube businesses. Terrell was responsible for supervising the day to day management of McQuik's.

Although McQuik's enjoyed immediate and significant growth and success, by 1984 the relationship between Gruppe and Pippenger had begun to sour. Their strained relationship stemmed primarily from philosophical difference regarding McQuik's future. Gruppe, Terrell and Anderson were opti-

mistic about McQuik's future and wanted to pursue a strategy of aggressive expansion through external financing. To that end, Gruppe determined that the shareholders needed to make either additional capital contributions or be willing to sign personal guarantees to secure third party financing. Pippenger, on the other hand, wanted to stabilize McQuik's expenditures and expand more slowly with only internally generated funds. He refused to sign any personal loan guarantees and also declined to make further capital contributions. In particular, Pippenger refused to personally guarantee a loan to cover credit extended by Quaker State to McQuik's for purchases of Quaker State products. As a result of this stalemate, Gruppe twice attempted to purchase Pippenger's entire interest in McQuik's, offering $165,000 on one occasion and $250,000 on another. Pippenger rejected both offers.

Thereafter, in November of 1986, Gruppe issued a notice to the McQuik's Board of Directors requesting a special meeting to increase the number of McQuik's authorized shares from 1000 to 10,000. Gruppe also issued a second notice for a special meeting to vote Pippenger off of the Board of Directors and remove him as Vice President. Upon receiving these notices, Pippenger filed a lawsuit in state court seeking a temporary restraining order preventing Gruppe and McQuik's from undertaking the proposed corporate action. The state court entered a temporary restraining order on January 5, 1987, and heard Pippenger's request for a preliminary injunction one week later. At the conclusion of the hearing, the state court dissolved the temporary restraining order and denied the preliminary injunction, finding that there was no proof that the proposed corporate actions were being taken in order to dilute Pippenger's interest or squeeze him out of the company. The Court concluded that Gruppe had not acted illegally, oppressively or in bad faith. Although Pippenger's request for a preliminary injunction was denied, the additional shares were never authorized and issued. By 1988, however, Gruppe had obtained a 51% interest in McQuik's by purchasing shares of stock from Anderson and Terrell.

Meanwhile, in January of 1986, executives of Quaker State/Minit–Lube, a supplier and major competitor of McQuik's, invited Gruppe and Terrell to attend a meeting in Chicago. The meeting was attended by at least four Quaker State officials, including Bill Gee, the President of Minit–Lube, and Roger Markle, the new Chairman of the Board of Quaker State Corporation. During the course of the meeting, Gruppe discussed potential financing arrangements with Quaker State and his desire to expand the McQuik's operation. At the conclusion of the meeting, one of the Quaker State officials asked Gruppe if he was interested in selling McQuik's. Gruppe responded by saying "if you've got 7, 8 million, we might listen." None of the Quaker State officials attending the meeting considered this a positive response.

Following the meeting Bill Gee contacted Gruppe on two other occasions in 1986 in order to ignite some interest in an acquisition of McQuik's. Thereafter, in April of 1987, Herb Butcher, Quaker State's Director of Acquisitions, spoke with Gruppe by telephone. Although Butcher does not recall the substance of the conversation, his notes of the discussion are as follows:

> Bill Gruppe, has five in Florida now/likes to talk—nice guy—he is a little pissed off because Pat Herman and allies were spreading rumors last month that he was selling. Want [sic] to—(sometime) but wants it confidential. Would like to come out to Salt Lake City [Quaker State/Minit Lube headquarters] maybe next month. Has oil jobber business, G & G Oil, but loves McQuik's business. Asked me a lot of questions about our expansion and what best store is. Told him I would call him next week.

The parties give vastly different interpretations to these notes, but Butcher never contacted Gruppe again, and Gruppe never visited Salt Lake City. It is undisputed that Gruppe never disclosed any of these contacts, meetings or telephone calls to Pippenger.

On August 3, 1987, Pippenger met with Terrell and Chris Miller, McQuik's Controller, to discuss McQuik's long-term capital needs. Pippenger tape-recorded their con-

versation. In that meeting Terrell and Miller informed Pippenger that McQuik's needed to make significant capital expenditures to replace underground storage tanks in order to comply with environmental requirements and to remodel existing outlets. Miller also offered three possible scenarios for the future ownership of McQuik's: (1) Pippenger could sell his interest in the company to Gruppe; (2) Pippenger could retain his interest in McQuik's and agree to guarantee loans or make capital contributions as needed; or (3) Pippenger could retain his shares, but the corporation would issue additional stock to raise capital thereby diluting Pippenger's interest.

Ultimately, Pippenger determined to sell his interest in McQuik's to Gruppe. Pippenger met with Gruppe and Miller in October of 1987 in order to determine the value of McQuik's stock with an eye to an eventual sale of Pippenger's interest to Gruppe. As he had done on August 12, Pippenger tape-recorded this conversation. During the course of the meeting, Pippenger asked Gruppe whether he had ever been approached by a big oil company regarding the prospect of purchasing McQuik's. Gruppe categorically denied that he had ever been approached by anyone. Gruppe claims that he denied ever being approached because he had never received a serious offer and had no intention of selling the business.

Although the parties had agreed to a sale of Pippenger's shares to Gruppe, they were at odds over the method of valuing the company. Pippenger wanted to employ an independent third party to appraise McQuik's in order to fix a price for his shares. Gruppe balked at the prospects of sponsoring a formal appraisal, however, and Pippenger eventually hired an international accounting firm to conduct an informal appraisal. The computations provided by Pippenger's accountants ranged from $262,000 to a maximum of $474,000. Negotiations continued between the parties, and Gruppe and Pippenger ultimately agreed to a purchase price of $450,000 for his shares. On July 27, 1988, Pippenger executed an Acquisition Agreement wherein he sold his entire interest in McQuik's to Gruppe. Contemporaneously

therewith, Pippenger executed a Mutual Release.

After purchasing Pippenger's shares, McQuik's began an aggressive expansion program. A new $400,000 line of credit was established at Bank One to fund the expansion. Additionally, Gruppe and Miller continued to seek financing from other sources, including Quaker State. At an auto service convention in the fall of 1988, Gruppe discussed a financing proposal with Quaker State officials. At the conclusion of that meeting the officials indicated that they would consider the proposal and get back with Gruppe at a later date. Gruppe met with the Quaker State officials again in November of 1988, at which time Gruppe was informed that Quaker State was not interested in participating in his financing arrangement. When asked if he would consider a merger with Quaker State, Gruppe indicated that he might. By late December of 1988, Gruppe and Quaker State had agreed in principal to a sale of McQuik's to Quaker State. Ultimately, the parties agreed to a merger whereby McQuik's shareholders would receive 750,000 shares of Quaker State stock which had a market value of approximately $12,656,250 million when the exchange of stock was finalized on May 10, 1989. Pippenger estimates that his 30% share would have been worth approximately $3.8 million. In June of 1989, a press release was issued announcing the terms of the deal. Pippenger filed this lawsuit some nine months later.

In his complaint, Pippenger charges Gruppe and McQuik's with violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (hereinafter collectively referred to as § 10(b)), violating the Indiana securities laws, Ind.Code § 23–2–1–1 to –24, and common law fraud. He also asserts a claim for breach of fiduciary duty against Gruppe. Each of the parties requests that the Court enter summary judgment in its favor on each of these claims.

## II. Analysis

### Federal Securities Fraud Claim

■ In Count I of his complaint, Pippenger alleges that Gruppe and McQuik's violat-

ed § 10(b) in connection with the transfer of his shares to Gruppe in July of 1988. Section 10(b) makes it unlawful to misrepresent or fail to disclose material information in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j(b); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In order to recover under § 10(b) a plaintiff must establish that the defendant (1) made a material misrepresentation or omission, (2) in connection with a securities transaction, (3) with the intent to deceive, and (4) which proximately caused the plaintiff's injury. *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 943 (7th Cir.1989); *Rowe v. Maremont Corp.,* 650 F.Supp. 1091, 1104 (N.D.Ill.1986), *aff'd,* 850 F.2d 1226 (7th Cir.1988). Pippenger argues that the undisputed facts in this case demonstrate that he has satisfied each of the elements of a § 10(b) claim against both of the defendants. Not surprisingly, each of the defendants contends that the undisputed facts show that Pippenger has failed to establish any of the requisite elements of his claim. The Court shall discuss the claim against Gruppe and McQuik's separately.

### Gruppe's Liability

■ In his complaint, Pippenger alleges that Gruppe violated § 10(b) by failing to disclose that he was engaged in negotiations with Quaker State for the merger or acquisition of McQuik's. The Court shall examine this allegation in the context of each of the requirements which must be shown in order to establish a securities violation under § 10(b).

### Materiality

■ The issue of materiality is a mixed question of fact and law, involving the application of a legal standard to a specific set of facts. *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). In *Rowe v. Maremont Corp.,* 850 F.2d 1226 (7th Cir.1988), *rehearing denied,* the Seventh Circuit explained that an omission or misstatement is material under Rule 10b–5 "if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering

the 'total mix' of information made available." *Rowe,* 850 F.2d at 1233 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988)). A misrepresentation or omission is material if there is a "substantial likelihood that, under all the circumstances, the omitted [or misrepresented] fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132. Only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law. *Id.*

Pippenger argues that merger, buy-out, or acquisition discussions regarding a closely-held corporation must be disclosed as a matter of law. In *Flamm v. Eberstadt,* 814 F.2d 1169 (7th Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987), the Seventh Circuit held that a public corporation need not disclose ongoing negotiations for a merger until an agreement in principle is reached on the price and structure of the deal. On the other hand, in *Michaels v. Michaels,* 767 F.2d 1185 (7th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986), the Seventh Circuit held that the "price and structure" rule allowing a public corporation to keep silent about impending negotiations for a merger is inapplicable to close corporations.

In *Michaels,* a minority shareholder of a closely-held corporation sold his stock back to the corporation. When the two remaining majority shareholders sold the corporation's assets for a considerably larger sum seven months later, the plaintiff brought suit alleging, *inter alia,* a violation of § 10(b). In his complaint, the plaintiff alleged that the defendants' failure to disclose that a third party had agreed to contact prospective purchasers for the company was a material omission. Affirming a judgment in favor of the plaintiff, the Court held that a jury could reasonably find that the failure to disclose the agreement to contact prospective buyers on behalf of the company was material. *Id.* at 1197. *See also Jordan v. Duff and Phelps, Inc.,* 815 F.2d 429 (7th Cir.1987); *Holmes v. Bateson,* 434 F.Supp. 1365 (D.R.I.1977), *aff'd in part,*

*rev'd in part on other grounds,* 583 F.2d 542 (1st Cir.1978).

Whether acquisition discussions involving a closely-held corporation cross the threshold of materiality depends upon the facts and circumstances of each case. *Basic,* 485 U.S. 224, 239–40, 108 S.Ct. 978, 987–88 (1988); *Michaels,* 767 F.2d at 1196. In *Basic,* the Supreme Court concluded that "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." *Id.,* 485 U.S. at 236, 108 S.Ct. at 986. It further noted factors which might be considered pertinent in the materiality determination:

> Whether merger discussions in any particular case are material ... depends on the facts. Generally, in order to assess the probability that the event will occur, a factfinder will need to look at indicia of interest in the transaction at the highest corporate levels. Without attempting to catalog all such possible factors, we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest. To assess the magnitude of the transaction to the issuer of the securities allegedly manipulated, a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value.

*Id.* at 239, 108 S.Ct. at 987. Whether the alleged information or event is material, " 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.' " *Id.* at 238, 108 S.Ct. at 987 (quoting *Securities Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1986), *cert. denied sub nom, Coates v. S.E.C.,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

Pippenger points to several events as demonstrating that Gruppe and Quaker State were involved in ongoing merger negotiations for the purchase of McQuik's: (1) the January 1986 meeting in Chicago between Gruppe and Quaker State officials wherein the subject of a sale of McQuik's was raised; (2) repeated contacts between Gruppe and Bill Gee president of Quaker State wherein Gee continued to express an interest in acquiring McQuik's; (3) Gruppe's telephone conversation with Herb Butcher, the Director of Acquisitions, regarding a possible sale of McQuik's; (4) the close proximity (five months) of Gruppe's agreement to sell McQuik's to Quaker State after Pippenger had sold his shares to Gruppe.

Gruppe contends that Pippenger has mischaracterized the nature of his contacts with Quaker State. That is, Gruppe contends that he was not engaged in merger discussions with Quaker State because the idea of a merger was not seriously discussed until after Gruppe had bought Pippenger's shares of stock. Even when viewed in the light most favorable to Pippenger, Gruppe argues that the events described above amount to nothing more than mere overtures, general inquiries, unilateral offers to negotiate, and indications of interest, all of which are immaterial as a matter of law. *See Hassig v. Pearson,* 565 F.2d 644, 649–50 (10th Cir.1977) (inquiries of majority shareholder regarding sale of his interest is immaterial); *Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1084 (5th Cir.1970) (unacknowledged unilateral offer to negotiate is immaterial); *Berman v. Gerber Products Co.,* 454 F.Supp. 1310, 1318 (W.D.Mich.1978) ("mere overtures" are immaterial).

The Court disagrees. Viewing the facts in the light most favorable to Pippenger, the Court believes that a reasonable jury could conclude that Gruppe and Quaker State were involved in ongoing merger negotiations. The subject of an acquisition was raised at the January 1986 meeting and Gruppe actually quoted a selling price of $7–8 million. Although Quaker State officials considered this price too high, Gee continued to communicate with Gruppe throughout 1986 regarding a possible acquisition. Another Quaker State official contacted Gruppe again in April of 1987 to discuss rumors that McQuik's was for sale. Finally, Gruppe agreed to sell McQuik's to Quaker State only five months after he purchased Pippenger's shares in the business. A jury could reasonably infer from

these events that Gruppe had been engaged in at least preliminary negotiations prior to July of 1988. That a jury *could* find these events material, however, does not mandate a finding in favor of Pippenger.

On the other hand, viewing the facts in the light most favorable to Gruppe, a reasonable jury could conclude that Gruppe had received nothing more than a series of unilateral overtures from Quaker State. Gruppe has testified that he had no desire to sell McQuik's until November of 1988 when Quaker State officials refused to provide him with additional financing to expand the company. Prior to that date, Gruppe argues that he and Quaker State participated in only one meeting which could be even remotely characterized as a merger discussion. Gruppe contends, however, that he attended the 1986 meeting in Chicago for the sole purpose of discussing the possibility of financing and that he never expressed any interest in selling McQuik's prior to or during that meeting. Quaker State officials testified that, prior to the meeting, they did not reveal to Gruppe that they were interested in discussing the possibility of an acquisition, and following the meeting they considered such an acquisition to be a "dead issue". In fact, Quaker State officials have testified that they never got past the initial inquiry in determining whether Gruppe was interested in selling McQuik's.

Gruppe contends that the remainder of his contacts with Quaker State officials were "good will" calls and that he continually stressed to Quaker State his desire to "grow" the company. In particular, Gruppe argues that Butcher's telephone log which indicates that Gruppe "wants to 'sometime' but wants it confidential" refers to his desire to visit the Quaker State/Minit Lube headquarters in Salt Lake City, not to his alleged desire to sell McQuik's. He corroborates this interpretation by pointing out that in late 1987 Quaker State offered to sell to him three existing Quaker State/Minit Lube franchises in Chicago. He argues further that it would be totally inconsistent for him to negotiate the purchase of Quaker State quick-lube stores when he was allegedly involved in ongoing negotiations to sell the McQuik's

enterprise to Quaker State. Examining the facts, a reasonable jury could conclude that Gruppe was not interested in selling McQuik's and did not engage in merger negotiations before November of 1988. However, Gruppe's version of events rests heavily on his credibility, as well as the credibility of several Quaker State officials. This is a determination that should be made by the factfinder. Accordingly, whether Gruppe was involved in merger discussions such that his failure to disclose his contacts with Quaker State constituted a omission of material fact is a question of fact for a jury to decide following a trial.

Scienter

■ In order to prevail on a Rule 10b–5 claim, a plaintiff must also demonstrate that the defendant acted with scienter. *Renovitch v. Kaufman,* 905 F.2d 1040, 1045 (7th Cir.1990); *Schlifke,* 866 F.2d at 943. The Supreme Court has defined scienter in the context of securities fraud as the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). Scienter may be established where a plaintiff proves that the defendants knowingly withheld or misstated material information. *See Sanders v. John Nuveen & Co.,* 554 F.2d 790, 792–93 (7th Cir.1977). It may also be established by a pattern of intentional deception on the part of defendants or it may be inferred from circumstantial evidence. *Michaels,* 767 F.2d at 1199 (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 691 n. 30, 74 L.Ed.2d 548 (1983)). In this circuit, proof that the defendant acted with reckless disregard for the truth is sufficient to meet this standard. *Rankow v. First Chicago Corp.,* 870 F.2d 356, 367 (7th Cir.1989); *Rowe.,* 850 F.2d at 1238; *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1039–1040 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

To establish scienter, Pippenger argues that Gruppe knowingly misrepresented that he had never been approached by companies interested in purchasing McQuik's when asked by Pippenger in October of 1987. The Court's conclusion that there are genuine

issues of material fact regarding whether Gruppe and Quaker State were involved in merger negotiations affects this determination as well. If the contacts between Gruppe and Quaker State can be characterized as merger negotiations, the fact that Gruppe denied that he had ever been approached by anyone interested in McQuik's may appropriately be interpreted as evidence of an intent to deceive. On the other hand, if these contacts were nothing more than mere overtures and therefore were not material, Gruppe's denial would likely not be evidence sufficient to support a finding of scienter.

Gruppe argues that even if his contacts with Quaker State are categorized as merger discussions, the element of scienter is lacking because he disclosed these contacts (in particular the January 1986 meeting in Chicago) during a deposition taken during the course of the state court proceedings that took place in late 1986. In other words, Gruppe contends that Pippenger was not entitled to rely on his denial in light of Gruppe's earlier state court testimony of which Pippenger had knowledge.

The deposition in question took place approximately one year before Gruppe denied Pippenger's inquiry regarding potential suitors for McQuik's. Further, an examination of the deposition testimony in question discloses that Gruppe testified that he had discussed a sale of McQuik's with Bill Gee of Quaker State, among numerous others. However, Gruppe characterized all the discussions as non-serious or not concrete. Gruppe did not disclose that he, in fact, stated that he would accept $7–8 million for the company, nor did he reveal any of his subsequent contacts with Quaker State.

Accordingly, the Court concludes that there are genuine issues of fact as to whether Pippenger had sufficient information to question Gruppe's stated positions and whether Gruppe's statements or omissions occurred with scienter in connection with the purchase of Pippenger's shares of McQuik's.

Causation

 In order to prosecute successfully a § 10(b) claim, a plaintiff must demonstrate that the defendant's conduct proximately caused his injury. In the Seventh Circuit, a plaintiff must establish both "transaction causation" and "loss causation" to satisfy this element. *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). In the present case, the parties limit their debate to a discussion of transaction causation. As defined by the Seventh Circuit, transaction causation is akin to the element of reliance. To establish transaction causation, or reliance, a plaintiff must demonstrate that the misrepresentations and omissions caused him to enter into the transaction at issue. *Kayne v. PaineWebber*, 703 F.Supp. 1334 (N.D.Ill.1989). A plaintiff suing under § 10(b) need not prove direct reliance on a material omission, however. Rather, there exists a presumption of reliance in cases involving a failure to disclose on the part of one under an affirmative duty to disclose the information in question. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Reliance is presumed only in instances where the plaintiff proves that the withheld information is deemed material. *Wright v. Heizer Corp.*, 560 F.2d 236, 249 (7th Cir.1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978).

Pippenger invokes the *Affiliated Ute Citizens* presumption of reliance to demonstrate that he has established the causal connection. Gruppe argues that Pippenger is not entitled to the presumption of reliance because the information he withheld was immaterial as a matter of law. Insofar as the Court has concluded that there are genuine issues of material fact regarding the materiality of the omitted information, there are necessarily questions of fact regarding the element of causation.

### McQuik's Liability

Pippenger urges the Court to find McQuik's liable for violating § 10(b) under two theories: as a principal, under agency law principles; and as an aider and abettor. The Court will address each argument in turn.

### Agency

 The parties do not dispute the general proposition that a corporation may act only

through its agents and officers. *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir.1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). In this case, Pippenger relies on the actions of Gruppe, Terrell and Miller as a basis for imposing secondary liability on McQuik's. There are several different types of common law agency theories that may lead to a corporate principal's vicarious liability for the wrongful acts of its agents: actual authority; apparent authority; and respondeat superior. *See In re Atlantic Financial Management, Inc.*, 784 F.2d 29, 31–32 (1st Cir.), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1986). The parties do not claim that McQuik's expressly authorized its agents to violate § 10(b). Rather, they debate whether either of the latter two theories may provide a basis for imposing vicarious liability on McQuik's.

Under the doctrine of respondeat superior, a corporation will be vicariously liable for the wrongful acts of its employees only when those acts are (1) committed within the scope of employment; (2) committed for the benefit of the corporation; and (3) authorized or subsequently ratified by the corporation. *Liquid Air Corp.*, 834 F.2d at 1306. Even if the officer's conduct was unauthorized and effected for his own benefit, secondary liability will flow to the corporation if the agent's conduct was clothed with the apparent authority of the corporation. *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 884 (3rd Cir.1975). In this instance, vicarious " '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business provided to him.' " *In re Atlantic Financial Management, Inc.*, 784 F.2d at 32 (quoting *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 (1982)). However, a corporation is not liable for the fraud of its officer when the officer acted as an individual for his own account and the defrauded party knew that the officer was not acting for the corporation. *Rochez*, 527 F.2d at 884.

The question of whether a closely-held corporation may be held secondarily liable for the acts of its agent in connection with the sale of its stock between shareholders is a novel one. Generally speaking, a corporation has no interest in the dealings of its officers and directors with respect to issues of its outstanding stock. *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980). Indeed, the Seventh Circuit has noted that "[i]nvestors, acting as investors, are not agents of the corporation." *Pommer v. Medtest Corp.*, 961 F.2d 620, 626 (7th Cir.1992). In *Pommer*, the co-founder and officer of a closely-held corporation sold some of his stock in the corporation to a third party. The plaintiffs sought to impose liability against the corporation on the basis of the officer's alleged fraudulent statements. In extensive *dicta*, the Seventh Circuit recognized that, in order for vicarious liability to attach to the corporation for any fraudulent misrepresentations the officer may have made in connection with the sale of his stock, he must have been acting within the scope of his authority. The court emphasized that the officer had sold the shares on his own account, not "on behalf of" the corporation. Without deciding the issue, the court remanded the case to the district court to determine the scope, if any, of the corporation's vicarious liability under those circumstances. Although the Seventh Circuit has not made any authoritative statements respecting the issue currently confronting the court, the case of *Johnston v. Wilbourn*, 760 F.Supp. 578 (S.D.Miss.1991) provides important guidance.

In *Johnston*, the plaintiffs sold their shares of stock in a closely-held bank to two individual defendants who served as the bank's officers and directors and majority shareholders. Shortly after the transaction, the bank merged with a second bank of which the defendants were minority shareholders and directors. Thereafter, the plaintiffs brought suit against both the individual defendants and the banks for violating § 10(b) for failing to disclose that the two banks had been engaged in ongoing merger negotiations. The plaintiffs sought to impose

liability upon the banks, *inter alia,* as principals of the individual defendants' wrongdoing utilizing agency concepts. Examining this contention, the court observed that the evidence revealed that the individual defendants had purchased the plaintiffs' shares themselves, utilizing funds drawn from the own personal bank accounts. In light of this undisputed evidence, the court concluded that the individuals were acting on their own behalf, not in their corporate capacities. Because the actions of the individual defendants could not be attributed to the banks, the court entered summary judgment in their favor. *See also Rochez,* 527 F.2d at 886 (refusing to find a basis for imposing vicarious liability against a corporation whose president violated § 10(b) in purchase of the corporation's stock from executive vice-president, noting that the parties where "dealing for themselves and for their own accounts.").

■ In the instant case, Pippenger urges the Court to impose liability against McQuik's on the basis of Gruppe's conduct in acquiring his shares of stock. Specifically, Pippenger argues that Gruppe was acting within the scope of his employment when he met or spoke with various Quaker State officials during 1986 and 1987. Gruppe's actions vis-a-vis Quaker State are irrelevant to a determination of whether vicarious liability should be imposed upon McQuik's for securities fraud in connection with the purchase of Pippenger's stock. Rather, the imposition of vicarious liability against McQuik's should be based on Gruppe's actions vis-a-vis Pippenger. Moreover, Pippenger cannot show that any actions Gruppe undertook in connection with the purchase of Pippenger's stock were done in the course of his employment. All the evidence in this case indicates that the transaction was nothing more than a private transaction between two shareholders. There have been no allegations that McQuik's purchased any shares of Pippenger's stock. Negotiations for the purchase were conducted exclusively between Pippenger and Gruppe. Each party was represented by counsel and Pippenger employed a private accounting firm to estimate the value of his stock. Further, the Acquisition Agreement clearly recites that Gruppe was the purchaser of Pippenger's stock, and Gruppe signed the agreement in his individual capacity, not as an officer of the corporation. Clearly, Gruppe was acting as an individual on his own behalf and not in his corporate capacity when he purchased Pippenger's shares. Nor can Pippenger claim that he mistakenly believed that Gruppe was acting on behalf of the corporation. Pippenger had been an officer and director of McQuik's for several years. He could not have been confused about Gruppe's authority. Gruppe's position did not enable him to perpetrate the alleged fraud upon Pippenger.

■ This conclusion does not end the Court's inquiry, however, for Pippenger also attempts to impute liability to McQuik's on account of Miller and Terrell's actions. It is undisputed that Terrell and Miller were officers and/or agents of McQuik's. Specifically, Pippenger alleges that Miller and Terrell misrepresented and failed to disclose certain information at the meeting between them in August of 1987. In essence, Pippenger claims that McQuik's is liable because Miller and Terrell's misrepresentations and omissions induced him to sell his stock to Gruppe.

Citing *Hobart v. Hobart Estate Co.,* 26 Cal.2d 412, 159 P.2d 958 (1945), McQuik's argues that it cannot be vicariously liable for Miller and Terrell's alleged misrepresentations or omissions because assisting in the sale of stock to a third party is not within the scope of a corporate agent's employment. In *Hobart,* the plaintiff alleged that the general manager and president of a small company induced him to sell his stock in the company to an outside third party. The plaintiff sought to impose liability against the company on the ground that the president/general manager was charged with the business of the corporation and was therefore acting within the scope of his agency in facilitating the sale. The California Supreme Court declined to impose liability against the corporation on this basis, stating:

> It does not appear, however, that Greene was acting within the scope of his duties as general manager of the company in negotiating the purchase of the stock from plaintiff. The transaction was between two individual shareholders.... Ordinarily, a

corporation is not interested in a sale of stock by one shareholder to another and, in the absence of special circumstances, such transactions are not within the implied authority of a general manager. Any possible advantage to the corporation derived from elimination of plaintiff as a stockholder was but incidental to the sale between the two individual shareholders and does not render the corporation liable. It cannot be said that the involuntary acceptance of the benefit, if any, justified the imposition of liability on the corporation on the theory of ratification, since any benefit from the sale was of such a nature that the corporation could not have rejected it.

159 P.2d at 979 (citations omitted). Likewise, McQuik's argues, because the transaction between Gruppe and Pippenger was a private one between individual shareholders dealing with respect to their own accounts, Miller and Terrell were not acting as agents of McQuik's when they met with Pippenger.

The instant case is distinguishable from *Hobart*. In that case, the court noted that the general manager "did not purport to act [on behalf of the corporation] and the plaintiff understood that he was acting as a representative of the estate and for the purchaser of the stock." *Id*. Accordingly, *Hobart* lacked any basis for imposing common law agency principles. In other words, the plaintiff's knowledge precluded the imposition of vicarious liability on the basis either of apparent authority or respondeat superior. In the instant case, however, there is some evidence from which a jury could conclude that Pippenger reasonably believed that Miller and Terrell were acting on behalf of the corporation. Miller and Terrell, for instance, stated that the reason they scheduled the August meeting with Pippenger was to discuss McQuik's immediate need for working capital. During that meeting Miller and Terrell repeatedly spoke of the company's goals and current needs. They discussed McQuik's desire to expand, the company's competitive position in the marketplace, the difficulty it faced in obtaining financing from outside sources and the need for capital contributions from its shareholders. Because the divisiveness between the shareholders was preventing McQuik's from meeting any of its needs and goals, Miller and Terrell proposed several options regarding Pippenger's future role in the company, to wit: sell his stock to Gruppe; decline to sell his stock and "come back in and be a part of the team"; or sit pat and refuse to "get back on the team and share the financial responsibility with the rest." *See Appendix to Plaintiff's Statement of Uncontested Facts,* Tab 21 at p. 13–14. Miller explained that the first two options would benefit the company but described the third as undesirable because it would detrimentally effect McQuik's ability to succeed in the long run. In light of this evidence, the Court concludes that there are genuine issues of material fact as to whether Miller and Terrell's conduct ought to be imputed to McQuik's.

Of course, there can be no recovery for securities fraud if the elements of that claim are not established. For vicarious liability to attach to McQuik's for securities fraud, the plaintiff must demonstrate that McQuik's agents violated § 10(b). The Court has previously set forth the elements of such a claim, but the discussion under that section was limited to an examination of Gruppe's potential liability. Inasmuch as the Court has determined that only Miller and Terrell's conduct can serve as a basis for imputing vicarious liability to McQuik's, the Court now addresses whether their actions violated § 10(b).

Section 10(b) prohibits a person from using or employing any "manipulative or deceptive device or contrivance" in connection with the sale of a security. 15 U.S.C. § 78j(b). Pippenger claims that Miller and Terrell engaged in two manipulative and deceptive acts: (1) Terrell failed to disclose that Quaker State was interested in acquiring McQuik's, and (2) Terrell and Miller made certain deceptive misrepresentations at the August 1987 meeting. Addressing the first contention, it is well established that in order for liability to attach for the failure to disclose information, there must first be a legal duty to disclose. *Chiarella v. United States,* 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980); *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928, 932 (7th

Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988) ("When the problem consists in keeping silence while the primary violator carries out the fraud, the plaintiff must show that the silent person had a legal duty to speak."). The duty to disclose arises not from the securities laws themselves but rather "from a fiduciary relation outside securities law." *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986)). State law is generally the source of this duty. *DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Pippenger contends that the source of Terrell's duty to disclose flows from the fiduciary duty an officer or director owes the shareholders of a corporation. Presuming the existence of Terrell's duty to speak, McQuik's argues that the undisputed evidence reveals that Terrell was not aware that Quaker State was interested in purchasing McQuik's.

McQuik's points out that Pippenger relies nearly exclusively on Terrell's participation at the January 1986 meeting in Chicago for evidence that Terrell knew of Quaker State's interest in McQuik's. McQuik's does not dispute that during this meeting Terrell overheard Quaker State officials express an interest in purchasing McQuik's. However, all the participants in the meeting have testified that after Gruppe quoted an inflated price for the company, the conversation ceased and the meeting disbanded. Thus, as far as Terrell was aware, Gruppe had rejected Quaker State's inquiry. There is no affirmative evidence in the record that indicates that subsequent to this meeting Terrell was made aware of any possible continuing negotiations between McQuik's and Quaker State. The Court focuses on Quaker State's continuing interest because, as it has previously discussed, the failure to disclose mere expressions of interest or unilateral overtures are not actionable under § 10(b). In order to constitute a manipulative or deceptive act, Terrell must have been aware that Quaker State and McQuik's were engaged in merger negotiations and failed to disclose that fact. Terrell however, has testified that he was not aware of any ongoing discussions with Quaker State regarding a possible purchase, and

Pippenger does not cite the Court to any evidence contradicting this assertion. There is no evidence in the record indicating that any Quaker State officials contacted Terrell or discussed with him a possible acquisition of McQuik's at any time after January of 1986. In fact, the evidence on this point indicates entirely to the contrary. In his deposition, Bill Gee, who admits that he contacted Gruppe on a few occasions in 1986, specifically denied that he had ever contacted Terrell. Further, the telephone logs of Herb Butcher, who admits having a telephone conversation with Gruppe in April of 1987, reflect that messages he left for Terrell were never returned. Finally, it would be unreasonable to infer, as Pippenger urges, that Gruppe would have informed Terrell of any subsequent contacts Gruppe may have had with Quaker State merely because Terrell was present at the Chicago meeting. To draw such an inference would be mere speculation.

Pippenger next alleges that Miller and Terrell misrepresented the financial condition of the company at the August 1987 meeting. Specifically, Pippenger alleges that during the meeting Miller and Terrell consistently told him of McQuik's need for immediate capital to repair underground storage tanks and to remodel existing facilities. Unfortunately, Pippenger does not explain how these statements were untrue. In fact, the undisputed evidence reveals that McQuik's had spent approximately $1.6 million on such repairs since August of 1987. Instead, Pippenger summarily concludes that "[i]n other words, Terrell and Miller represented to Dr. Pippenger that the value of his stock would not grow in the future because all additional capital contributions would be merely used for repair and remodeling, rather than growth." *See Plaintiff's Response in Opposition to Defendant McQuik's Motion for Summary Judgment* at p. 10. Evidently Pippenger believes these statements were false because they misled him about McQuik's future prospects for growth in view of Quaker State's alleged interest in an acquisition. Similarly, Pippenger contends that Terrell stated that if Pippenger did not sell his stock to Gruppe, the stock would be

diluted when McQuik's issued additional shares to obtain the capital required to meet its needs. Pippenger argues that this statement was false because Terrell knew that Quaker State was interested in purchasing McQuik's and therefore knew that the stock would likely increase in value, not be diluted. Interestingly, Pippenger claims that "[i]t is not necessarily *what* Terrell and Miller said that is significant, but what they said combined with what was *not* disclosed." *Id* at 10 (original emphasis). In essence, Pippenger relies not on what was stated by Miller and Terrell but on their failure to disclose Quaker State's interest in purchasing McQuik's as demonstrating a genuine issue of material fact. As discussed above, however, Terrell was not aware of Quaker State's interest in McQuik's, and the record is entirely devoid of any evidence indicating that Miller was aware of Quaker State's alleged interest either. Pippenger has wholly failed to demonstrate that existence of a genuine issue of material fact regarding whether McQuik's committed a manipulative or deceptive act through its agents. Although this is only one of the elements of a § 10(b) claim, the Court declines to address the others in view of the already lengthy nature of this order. Having failed to establish that either Miller or Terrell violated § 10(b), McQuik's cannot be held vicariously liable for such a violation utilizing agency principles.

Aiding and Abetting

Pippenger also seeks to impose liability against McQuik's for aiding and abetting Gruppe in his alleged violation of § 10(b). Although the Seventh Circuit has recognized a cause of action for aiding and abetting a § 10(b) violation, the commission of a manipulative or deceptive act is one of the minimal requirements a plaintiff must establish in order to demonstrate such a claim. *See Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1123 (7th Cir.1990) (citing cases), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). Insofar as the Court has determined that Miller and Terrell did not commit a manipulative or deceptive act in connection with the purchase of Pippenger's stock, Pippenger's aiding and abetting claim must necessarily also fail. Accordingly, the Court concludes that there is no genuine issue of material fact, and McQuik's is entitled to judgment as a matter of law on Pippenger's federal securities fraud claim.

**State Securities Fraud Claim**

Each of the parties also contends that it is entitled to summary judgment on Pippenger's state law securities fraud claim. Indiana Code § 23–2–1–12 (1989 Burns Ann. Code) prohibits fraudulent practices with respect to the sale of securities in this state.[1] Material misrepresentations and omissions made in connection with the sale of a security are prohibited practices under the statute. *Crook v. Shearson Loeb Rhoades, Inc.,* 591 F.Supp. 40, 49 (N.D.Ind.1983); *B & T Distributors, Inc. v. Riehle,* 359 N.E.2d 622, 625 (Ind.Ct.App.1977). A statement or omission is considered material where a reasonable investor would have considered it important in making his investment decision. *Arnold v. Dirrim,* 398 N.E.2d 426 (Ind.Ct.App.1979).[2] Each of the parties concedes that materiality under the Indiana antifraud provisions is substantially similar to the requirement of

1. Specifically, the antifraud provisions of the Indiana Securities Act provide as follows:

 It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly,
 (1) To employ any device, scheme or artifice to defraud, or
 (2) To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading, or
 (3) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

2. The parties are somewhat at odds over the requisite state of mind which must be established in order to prove a violation of the statute. Pippenger maintains that mere negligence is all that is necessary to prove a violation, citing *Crook,* 591 F.Supp. at 49. The defendants contend that scienter as it has been interpreted under the federal securities laws may be the applicable standard. *See, Perry v. Eastman Kodak Co.,* 1991 U.S.Dist. LEXIS 20914 (S.D.Ind.1991). The Court does not need to resolve the question at this juncture in order to dispose of the current motions, and so it does not.

materiality under the federal securities laws, and the Court concurs. Accordingly, for the reasons previously addressed in this order, genuine issues of material fact exist which preclude the entry of summary judgment in favor of either Pippenger or Gruppe. However, McQuik's is entitled to summary judgment on this claim for the same reasons that it was entitled to summary judgment on Pippenger's federal securities fraud claim.

### Release of Federal and State Securities Claims[3]

■ In support of his motion for summary judgment, Gruppe also argues that the terms of the Mutual Release executed in connection with the transaction preclude Pippenger's federal and state securities law claims.[4]

■ Federal law governs all questions relating to the validity of a purported release of federal securities claims. *Petro–Ventures, Inc. v. Takessian,* 967 F.2d 1337, 1340 (9th Cir.1992) (applying federal law to federal securities claims despite that settlement agreement called for application of the laws of California); *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.,* 558 F.2d 1113, 1115 (2nd Cir.1977). Accordingly, an analysis of this issue necessarily begins with reference to the federal anti-waiver provision found in § 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(a). That provision provides:

> Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

The Seventh Circuit has held that this provision mandates that a release of claims under the securities laws is valid only as to mature, ripened claims of which the releasing party had knowledge before signing the release. *Hamilton v. Harrington,* 807 F.2d 102, 106 (7th Cir.1986); *Goodman v. Epstein,* 582 F.2d 388, 402 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) (citing *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953)).

Pippenger does not argue that his securities claims were not mature at the time he executed the release. Rather, he contends that he had no knowledge of such claims and that Gruppe obtained the release by fraud when he misrepresented that he had not been contacted by anyone about the prospects of purchasing McQuik's. Gruppe, on the other hand, asserts that Pippenger had actual knowledge of the claims by virtue of being privy to Gruppe's deposition testimony given in connection with the state court lawsuit in 1986 wherein Gruppe described the conversations he had had with various potential buyers, including Quaker State, and that in light of this knowledge he cannot now claim that Gruppe's representations misled him.

■ In *Goodman,* the Seventh Circuit made clear that a party has a duty of inquiry when signing a release. 582 F.2d at 403. The court stated that "[t]he mere fact that an individual has been asked to sign a release should be sufficient to put that individual on notice that a reasonable inquiry should be undertaken" into the matter concerning which the release was executed. *Id.* at 404. The scope of inquiry extends to that which

---

3. Gruppe and McQuik's each advances this argument in support of their respective motions for summary judgment. Because the Court has determined that McQuik's may not be held liable for either the federal or state securities fraud claims, however, the current discussion refers only to Gruppe. Of course, the analysis would apply equally to both defendants.

4. The release provision at issue is found at ¶ 1 of the Mutual Release and provides as follows:

> Pippenger does hereby release and discharge Gruppe and McQuik's ... from any and all actions, claims, demands, contracts, liabilities or damages of any kind or nature, known or

unknown, including any that may now exist in any way related to or emanating from the ownership by Pippenger of such stock or partnership interests, and the rights and entitlements associated therewith, including any and all claims which are or could have been incorporated into the litigation initiated by Pippenger and now pending against William H. Gruppe, Jr. and McQuik's Oilube, Inc. in the Grant Circuit Court under Cause Number C–86–946.

*See Defendants Answer and Affirmative Defenses,* Exhibit F at Tab 12.

could have been discovered upon reasonable inquiry at the time the release was executed. What constitutes a reasonable inquiry will differ from case to case. "In many cases, it may involve only the questioning of the person or persons seeking the release." *Id.* However, a release procured by fraud may be set aside. "[A]ny deception by [the party seeking the release] ... could amount to fraud in the procurement of the release, which would clearly have invalidated the release." *Id.*

Because this basis for summary judgment is exclusively advanced by Gruppe, the Court must view the evidence in the light most favorable to Pippenger. Examining the deposition testimony in question, Gruppe testified that he had discussed a sale of McQuik's with Bill Gee of Quaker State, among numerous others. However, he characterized all the discussions as nonserious or not concrete, just "the type of bantering between the business". *See* Deposition of William Gruppe, Joint Appendix to Motions for Summary Judgment, at Tab 2 p. 57. Gruppe did not disclose that he in fact stated that he would accept $7–8 million for the company nor did he disclose any other details of that conversation. Of course, he did not reveal that he had several subsequent contacts with various Quaker State officials over the course of the next two years or the nature of those contacts. Further, as shareholders in a closely-held corporation, Gruppe and Pippenger stood in a fiduciary relationship to one another. Notwithstanding this fiduciary relationship, Gruppe expressly denied having received any purchase offers for McQuik's when asked by Pippenger in October of 1987. Under these circumstances, the Court concludes there are genuine issues of material fact regarding the enforceability of the release which foreclose summary judgment on these claims.

 This conclusion also controls Gruppe's contention that the release bars Pippenger's state law securities fraud claims. State law governs the validity of the purported release of these claims, *See Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1341 (7th Cir.1992) (applying Illinois law to determine validity of release of Illinois securities fraud claim), and under Indiana law, a party may avoid a release if it was procured by fraud. *Indiana Insurance Co. v. Handlon*, 216 Ind. 442, 24 N.E.2d 1003, 1005 (1940); *Prall v. Indiana National Bank*, 627 N.E.2d 1374, 1378 (Ind. Ct.App. Feb. 2, 1994). In order to avoid a release on the grounds of fraud, the releasor must demonstrate that he relied on the misrepresentations. *Prall*, 627 N.E.2d at 1379. Indiana law also imposes upon a party executing a release the duty to exercise reasonable care. *Plymale v. Upright*, 419 N.E.2d 756, 762 (Ind.Ct.App.1981). Generally speaking, however, the issues of reasonable diligence and reasonable reliance are questions of fact for the jury to decide. *Plymale*, 419 N.E.2d at 763 n. 6. In light of the evidence explicated above, the Court cannot conclude as a matter of law "either that the representations are not actionable or that the plaintiff[ ] had no right to rely[.]" *Id.* at 763. Accordingly, the Court concludes that there are genuine issues of material fact as to whether the release precludes Pippenger's state law securities fraud claims.

**Common Law Fraud**

 In Indiana, the elements of actual fraud are:

1. a material misrepresentation of past or existing fact by the party to be charged which

2. was false,

3. was made with knowledge or in reckless ignorance of the falsity,

4. was relied upon by the complaining party, and

5. proximately caused the complaining party injury.

*Biberstine v. New York Blower Co.*, 625 N.E.2d 1308, 1315 (Ind.Ct.App.1993). A claim for actual fraud may only be based on misrepresentations of past or existing facts. *Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 141 (7th Cir.1990) (applying Indiana law; *Sachs v. Blewett*, 206 Ind. 151, 188 N.E. 674 (1934); *Comfax Corp. v. North American Van Lines*, 587 N.E.2d 118 (Ind.Ct.App. 1992).

Once more, insofar as Pippenger's fraud claims against Gruppe and McQuik's require proof of the same elements as a federal securities fraud claim (material misrepresentation, reliance, and causation), the Court's prior discussion of these issues is controlling. Hence, only McQuik's is entitled to summary judgment on this claim.

**Breach of Fiduciary Duty**

■ Pippenger has also asserted a claim for breach of fiduciary duty against Gruppe. The parties agree that shareholders in a closely-held corporation stand in a fiduciary relationship to other shareholders. *W & W Equipment Co., Inc. v. Mink,* 568 N.E.2d 564, 570 (Ind.Ct.App.1991). This fiduciary relationship places on the shareholders the duty to deal with one another "fairly, honestly and openly". *Id.* at 571. Pippenger claims that Gruppe did not deal with him fairly when he failed to disclose that he had been engaged in merger negotiations with Quaker State and later when he misrepresented his involvement with Quaker State.

■ Pippenger does not cite any cases which hold that a shareholder's failure to disclose unilateral overtures of acquisition proposed by third parties constitutes a breach of fiduciary duty. For that matter, Pippenger has failed to cite any law from which this Court could infer or conclude that the failure to report the existence of merger negotiations amounts to a breach of a shareholder's fiduciary duty. Conceding the latter point for the moment, the Court is required to conclude that the determination of whether Gruppe breached his fiduciary duty to Pippenger by failing to disclose his contacts with Quaker State is governed by its previous discussion regarding Pippenger's § 10(b) claim. That claim, like the current one, is predicated upon the allegation that Gruppe was involved in merger negotiations with Quaker State. However, the Court has previously concluded that whether Gruppe was involved in merger discussions with Quaker State is a question of fact for the jury to decide following a trial. Additionally, there are genuine issues of material fact regarding Gruppe's state of mind and Pippenger's reasonable reliance which may affect the determination of whether Pippenger had been

treated unfairly. Accordingly, the Court must deny the motions for summary judgment on this claim as well.

### III. Conclusion

Accordingly, by reason of the foregoing, the Court hereby GRANTS McQuik's motion for summary judgment against Pippenger. The Court DENIES Pippenger's motion for summary judgment against Gruppe and McQuik's and DENIES Gruppe's motion for summary judgment against Pippenger.

IT IS SO ORDERED.

### ENTRY AND ORDER OF MAY 31st, 1994

This matter is before the Court on the motion of plaintiff, Dr. Joseph I. Pippenger, Jr. ("Pippenger"), to amend judgment pursuant to Fed.R.Civ.P. 59(e) so as to deny summary judgment which the Court entered in favor of McQuik's Oilube, Inc. ("McQuik's"), on March 25, 1994. Having reviewed the motion and the supporting memoranda of law, the Court concludes that the motion should be denied.

### Decision

On March 22, 1994, the Court entered summary judgment in favor of McQuik's, finding that there was no basis for imposing vicarious liability against it for the alleged wrongful acts of its agents Doug Terrell ("Terrell") and William Gruppe ("Gruppe"). *See* Entry and Order of March 25, 1994 ("Entry") at p. 13–22. With respect to Terrell, the Court determined that the imposition of vicarious liability against McQuik's would be appropriate only if Terrell had knowledge that Quaker State and McQuik's were engaged in ongoing merger negotiations. In this regard, the plaintiff relied exclusively upon Terrell's attendance and participation in a meeting with Quaker State officials held in January of 1986. Examining the circumstances surrounding that meeting, the Court concluded that "[t]here is no affirmative evidence in the record that indicates that subsequent to [the January 1986] meeting, Terrell was made aware of any continuing negotiations between McQuik's and Quaker State." *See* Entry at p. 19. Pippenger now complains that the Court did not

draw the inferences most favorable to him in reaching this determination.

Pippenger points to several facts which he contends demonstrate that a genuine issue of material fact exists as to whether Terrell was aware of subsequent merger discussions. First, the fact that Gruppe did not flatly reject Quaker State's inquiry as to whether he was interested in selling McQuik's and that he later sold the company to Quaker State for a price in excess of the price he allegedly quoted at the meeting does not indicate that a possible sale was an open issue in Terrell's mind. Even if the Court were to accept the proposition that Terrell believed a future sale of McQuik's was possible merely by attending the 1986 meeting, this has no bearing on whether Terrell was actually aware of any alleged subsequent negotiations.

Pippenger next contends that (1) the use of the word "they" in the March 21, 1986 Quaker State Minute Board minutes when summarizing the subject of a possible acquisition of McQuik's refers to Gruppe and Terrell; and (2) Herbert Butcher's repeated attempts to contact Terrell in April of 1987, although unsuccessful, indicate that Quaker State believed that Terrell would have useful information on the subject of an acquisition. The Court was well aware of and considered this evidence in resolving the cross motions for summary judgment in this case. It would be unreasonable for the Court to draw either of these inferences as they are little more than mere speculation.

Pippenger also contends that the record contains facts supporting an inference that Gruppe was acting in his corporate capacity in connection with the sale of his stock to Gruppe. Pippenger contends that the Court's findings on this issue are unsupported by the record and contradict other findings.

The Court determined that McQuik's was not vicariously liable on the basis of Gruppe's conduct in acquiring Pippenger's shares of stock because "Gruppe was acting as an individual on his own behalf." *See* Entry at p. 16. As explained in the entry, there have

been no allegations that McQuik's purchased any shares of Pippenger's stock. Further, Gruppe signed the Acquisition Agreement in his individual capacity, not as an officer of the corporation. These facts standing alone are sufficient to support the conclusion that Gruppe was acting in his individual capacity in connection with the purchase of Pippenger's shares. *See Johnston v. Wilbourn*, 760 F.Supp. 578 (S.D.Miss.1991) (refusing to impose vicarious liability against two banks where the individual defendants serving as officers, directors and majority shareholders in both banks utilized funds drawn from their own personal accounts to purchase plaintiffs' shares).

That Gruppe was acting in his individual capacity in purchasing Pippenger's shares does not contradict the Court's earlier findings that Gruppe acted in his corporate capacity in prior instances. Nor does this conclusion contradict the Court's finding that a jury could conclude that Pippenger reasonably believed that Miller and Terrell were acting on behalf of the corporation. This latter conclusion was premised on the fact that Miller and Terrell purported to act as agents of McQuik's when they met with Pippenger. The Court refused to excuse McQuik's from liability on the basis of Miller and Terrell's statements merely because the transaction between Gruppe and Pippenger was a private one. In other words, the Court recognized that not all parties who may be involved in a transaction do so in the same capacity.[1]

Pippenger also contends that the record does not support the assertion that Pippenger could not claim that "he mistakenly believed that Gruppe was acting on behalf of the corporation" *see Entry* at p. 16, because Gruppe previously conceded that he did not advise Pippenger of the daily operations of the company, and because he had been removed as an as an officer and director of the company. As the Court explained in its entry, because Pippenger had been an officer and director of McQuik's for several years, he knew the extent of Gruppe's authority. The fact that Pippenger may not have served in this capacity for the 1½ years immediately

---

1. Although the Court stated that negotiations were conducted exclusively between Pippenger and Gruppe, the Court repeatedly acknowledged throughout the entry the role that other participants played with respect to the transaction, including Miller and Terrell.

prior to the transfer of his shares to Gruppe does not alter that conclusion. Gruppe's position did not enable him to perpetrate the alleged fraud upon Pippenger. Gruppe had been attempting to purchase Pippenger's shares for himself for several years in an attempt to control the company. Prior to executing the Acquisition Agreement in 1988, Gruppe had twice attempted to purchase Pippenger's shares of stock, although Pippenger refused to sell. *See Entry* at p. 2. Pippenger cannot now claim that he believed Gruppe was acting in his corporate capacity when Gruppe finally convinced him to sell his shares in 1988. In fact, in the memorandum submitted in support of the instant motion, Pippenger concedes that the attorney who assisted him in final negotiations confirmed that Gruppe was purchasing the stock individually at least several months before the transfer. *See* Memorandum in Support of Motion to Amend Judgment at p. 10. In short, although Gruppe may have engaged in activities that may be construed as those of an agent of McQuik's, Gruppe's position did not facilitate the perpetration of the alleged fraud.

### Conclusion

Accordingly, by reason of the foregoing, the Court hereby DENIES the plaintiff's motion to amend the judgment entered in favor of McQuik's on March 25, 1994.

IT IS SO ORDERED.